**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 24 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

                             No. 00-3138

LORENZO ZUBIA-MELENDEZ,

     Defendant-Appellant.

---

**Appeal from the United States District Court**
**for the District Court of Kansas**
**(D.C. No. 99-CR-20092-02-GTV)**

---

Michael L. Harris, Assistant Federal Public Defender, Kansas City, Kansas, for Defendant-Appellant.

Nancy Landis Caplinger, Assistant United States Attorney (Jackie N. Williams, United States Attorney for the District of Kansas, with her on the brief), Kansas City, Kansas for Plaintiff-Appellee.

---

Before **EBEL**, **ANDERSON** and **BALDOCK**, Circuit Judges.

---

**EBEL**, Circuit Judge.

Defendant-Appellant Lorenzo Zubia-Melendez appeals the district court's denial of his motion to suppress evidence seized from his vehicle following a traffic stop and subsequent search of his vehicle. After the district court denied the motion, Appellant entered a conditional guilty plea on one count of possession with intent to distribute more than 5 kilograms of cocaine in violation of 21 U.S.C. §841(a)(1). Appellant argues on appeal that the traffic stop preceding the search was not supported by probable cause, that the questions asked by the officer were not reasonably related to the purpose of the traffic stop, and that Appellant did not freely and voluntarily consent to the search of his car. Exercising jurisdiction pursuant to 28 U.S.C. §1291, we AFFIRM.

**BACKGROUND**

Appellant's car, a 1999 Chevrolet Tahoe with Texas plates, was parked in the parking lot of a Best Western motel in Kansas City, Kansas, on the night of October 13, 1999. Ray Bailiff, a Kansas Highway Patrol Trooper assigned to the Drug Enforcement Administration ("DEA"), noticed the vehicle and checked its license plates against the motel registration card, at which point he learned that the vehicle was registered to Appellant and that Appellant had paid for the motel room with cash. Officer Bailiff also checked whether the car had recently crossed the border between the United States and Mexico and learned that the car had

- 2 -

crossed the border at 10:08 a.m. on October 12, 1999. Finally, Officer Bailiff checked the motel's phone records and discovered that at least one telephone call had been made from Appellant's room to individuals whom Officer Bailiff knew were involved in the drug trade.

The vehicle was then placed under surveillance. Kansas Highway Patrol Officer David Heim, a member of the surveillance team, was told that the car had recently crossed the border between the United States and Mexico and that officers believed the car might be being used in drug trafficking activity. He was instructed to stop the car if an opportunity presented itself. He was not specifically informed of the many investigative activities undertaken by other officers in regard to Appellant prior to that point in time.

The vehicle left the motel parking lot on October 14, 1999, at approximately 10:15 a.m. Officer Heim was advised by radio that the car was leaving the motel and traveling northbound on Seventh Street toward the I-35 interchange. Officer Heim pulled in behind the vehicle and followed it as it drove along Seventh Street and across the Kansas River Bridge. This is a four-lane highway, with two lanes of northbound traffic and two lanes of southbound traffic. The car was in the far right lane of northbound traffic. Officer Heim testified that the driver of the car allowed the car to drift approximately 2 feet into the left lane of northbound traffic, but that the car came "right back over"

after only a "couple of seconds." Officer Heim then initiated a traffic stop, which he explained at the suppression hearing with the statement: "[I]t's a violation of the law to cross over the lane lines. It didn't give a signal and it just looked like it was drifting basically out of control into the other lane."

Officer Heim's car is equipped with a video recorder. Although Officer Heim stated that he activated the recorder "as soon as he realized that the vehicle was across the lane line," the video recording does not show the vehicle straddling the two lanes; instead, the video recording shows the tires of the vehicle close to touching the white dividing line between the two northbound lanes. Heim explained that there was a "very slight" delay between the time he turned on the recorder and the time when the recording commenced.

After stopping the vehicle, Officer Heim proceeded to question both Appellant, who owned the car but was riding in the passenger seat at the time of the stop, and the driver, later identified as Jorge Javier Galindo-Diaz. Officer Heim first asked Galindo-Diaz for his driver's license, but Galindo-Diaz stated that he did not have one. Officer Heim ordered Galindo-Diaz out of the car and toward the back of the vehicle, and briefly remained at the passenger-side door of the vehicle to question Appellant. Officer Heim asked Appellant for the name of the driver, which the Appellant stated he did not know despite his assertion that the driver was his brother-in-law. Appellant stated that he and his wife, as well

as the driver, had stayed at a motel the previous night. Officer Heim then questioned Galindo-Diaz. Galindo-Diaz stated that he did not know Appellant's name and that he had stayed at his Kansas City home (and not in a motel) the previous night. At that point, Officer Heim returned to Appellant, who again asserted that he had stayed with Galindo-Diaz in a motel the night before. Appellant also told Officer Heim that he was the registered owner of the vehicle and provided the vehicle's registration information to the officer. The registration indicated that the vehicle's insurance was expired. Officer Heim briefly took the Appellant out of the vehicle to frisk him and then placed him back inside the vehicle on the passenger's side.

Because the stories of the two men conflicted, Officer Heim became suspicious that the two might be engaged in criminal activity. Officer Heim therefore issued a warning on the traffic violation[1] and, without telling either man that he was free to go or that they could move from the positions into which he had ordered them, asked Galindo-Diaz if he could search the car for drugs. Galindo-Diaz replied "yes." Because Appellant had asserted ownership of the

---

[1] It is unclear whether Officer Heim handed Galindo-Diaz the registration for the vehicle at this time. The exchange takes place off-screen. While Officer Heim did not mention returning the registration during his testimony at the suppression hearing, it appears from the videotape that he is not carrying it when he approaches Appellant immediately after obtaining permission to search the car from Galindo-Diaz. In any event, Zubia-Melendez does not make an argument on the basis of whether the registration had been returned.

vehicle, Officer Heim then asked him for permission to search the car for drugs. Appellant initially responded to the question by stating, "No, never." Officer Heim then immediately asked again if he could search the vehicle and Appellant replied "Yeah, no matter."[2]

Officer Heim understood this exchange to provide consent to search Appellant's car. The search of the car, which lasted approximately 16 minutes, was initially unsuccessful because the drug-sniffing dog gave false alerts on a bag in the backseat of the vehicle. Officer Heim then took the dog out of the car and continued the search. He noticed that the molding in the right rear corner of the vehicle "wasn't fitting just exactly like it would have from the factory" and the screws holding it in place looked tampered with. Eventually, Officer Heim was joined by three other officers and they uncovered 5.7 kilograms of cocaine hydrochloride in a hidden compartment.

All of the above testimony, as well as the videotape itself, was presented at the suppression hearing. In addition, both Appellant and Galindo-Diaz testified

---

[2] Officer Heim stated that he asked a second time to search the car because he believed Appellant had not understood the question due to Appellant's "blank look like he was just trying to hang with me in conversation." Officer Heim further testified that the blank expression on Appellant's face disappeared when he asked the question a second time, and that Appellant then consented to the search. He admitted on direct examination, however, that he did not come to the conclusion that the Appellant had not understood his question the first time until he watched the videotape being played in court at the suppression hearing.

with the help of an interpreter. Galindo-Diaz testified that he did not believe he had crossed the white dividing line while driving because he was aware that he was being followed and was trying to drive carefully. He could not conclusively say he had not crossed the line but stated "I don't remember, but I don't remember doing it or I don't think I'll do it. And you can't see it on the tape. I don't think I'll cross it."

Appellant testified that he did not understand what he was being asked when Officer Heim asked him if he could search the vehicle. He admitted on cross-examination, however, that he had understood Officer Heim's request for his name and identification, as well as his question regarding ownership of the vehicle.

The district court denied the motion to suppress. Important to this appeal are the following aspects of the district court's conclusion: (1) the court specifically found the testimony of Officer Heim relating to the purpose of the stop to be credible; (2) the court found that Officer Heim had reasonable suspicion to detain the Appellant and Galindo-Diaz to ask about narcotics based upon their conflicting answers to the officer's questions and Galindo-Diaz's lack of a valid driver's license; and (3) the court stated that Appellant understood enough English to consent voluntarily to the search.

**DISCUSSION**

I.  Standard of Review

"In reviewing the denial of a motion to suppress, we must accept the district court's factual findings unless clearly erroneous and we view the evidence in the light most favorable to the prevailing party." United States v. Springfield, 196 F.3d 1180, 1183 (10th Cir. 1999).  The ultimate determination of the reasonableness of a warrantless search or seizure under the Fourth Amendment is a determination of law that we review de novo.  See United States v. Pena, 920 F.2d 1509, 1513-14 (10th Cir. 1990).


II.  Analysis

A. The initial traffic stop was supported by probable cause

The first question we must address is whether the initial seizure of the vehicle was supported by probable cause.  The government bears the burden of proof to justify warrantless searches and seizures. See United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993).  The standard of proof imposed upon the party who carries the burden, in this case the government, is a preponderance of evidence.  See United States v. Matlock, 415 U.S. 164, 177 (1974).

Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the

stop is limited and the detention is brief. See United States v. Gregory, 79 F.3d 973, 977 (10th Cir. 1996); see also Delaware v. Prouse, 440 U.S. 648, 653 (1979). "Therefore, the stop is 'subject to the constitutional imperative that it not be "unreasonable" under the circumstances.'" United States v. Ozbirn, 189 F.3d 1194, 1197 (10th Cir. 1999) (quoting Whren v. United States, 517 U.S. 806, 810 (1996)). A traffic stop is reasonable under the Fourth Amendment if the officer has either "(1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." Ozbirn, 189 F.3d at 1197 (quotation marks and citations omitted).

Here, Officer Heim testified that he saw the vehicle drift approximately two feet over the dividing line into the left lane of northbound traffic, which he considered a violation of Kansas law.[3] See Kan. Stat. Ann. § 8-1522. The Kansas statute states that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane

---

[3] The government does not argue that Galindo-Diaz's weaving created reasonable suspicion for Officer Heim to conduct a safety stop for possible intoxication or fatigue, as allowed under Kansas law in certain limited circumstances. See State v. Vistuba, 840 P.2d 511, 514 (Kan. 1992) (allowing safety stops where the "safety reasons are based upon specific and articulable facts").

until the driver has first ascertained that such movement can be made with safety." See id. Although the videotape submitted by the government does not show the vehicle crossing over the dividing line between the two northbound lanes of traffic, it does show that Galindo-Diaz tended to drive on the left side of the lane and that his tires were at least close to touching the dividing line in the first few frames. This is consistent with Officer Heim's testimony that he activated the video recorder only after observing the traffic violation, and experienced a slight delay before the videotape began to record, and thus that the videotape is not a comprehensive record of the traffic violation. More important to our analysis, the district court specifically found that Officer Heim's testimony was credible as to the purpose of the traffic stop, which necessarily involved its crediting Officer Heim's relation of events while simultaneously discounting Galindo-Diaz's testimony that he did not believe he crossed the white dividing line.

We see no reason to question the credibility determinations of the district court. We therefore find that Officer Heim had probable cause to believe that a traffic violation had occurred once he saw the vehicle cross over into the left lane of northbound traffic.[4]

---

[4] In Ozbirn, 189 F.3d at 1198, we held that "under the language of the Kansas statute, when an officer merely observes someone drive a vehicle outside

(continued...)

B.  The questioning of Appellant and Galindo-Diaz was reasonably related to the purposes of the stop

This court has stated that an officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation.  See United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998); United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989).  After the officer has issued the citation, however, the driver "must be allowed to proceed on his way, without being subject to further delay by police" if he has produced "a valid license and proof that he is entitled to operate the car."  See United States v. Lee, 73 F.3d 1034, 1039 (10th Cir. 1996).  An officer who is presented with the requisite information may nevertheless detain a suspect for further questioning if the officer has an "objectively reasonable and articulable suspicion that illegal activity has occurred or is

---

[4](...continued)
the marked lane, he does not automatically have probable cause to stop that person for a traffic violation."  We thus stated that a court must conduct a fact-specific inquiry into "all the surrounding facts and circumstances to determine whether the officer had the probable cause necessary to justify the stop."  Id.  In this case, however, Appellant has not argued that Officer Heim did not have probable cause to stop the vehicle after observing it briefly weave outside the driver's lane only one time.  For that reason, we deem the issue waived and will not address it on appeal.  See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

occurring" or if the suspect consents to additional questions.  See United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994).

We agree with the district court that Officer Heim's actions between the time of the stop and his request to search the car were reasonable under the circumstances.  It is undisputed that Officer Heim was entitled to request vehicle registration and a driver's license from Galindo-Diaz.  See Hunnicutt, 135 F.3d at 1349.  Despite the fact that he was driving the car, Galindo-Diaz could not produce a valid driver's license, nor any other form of photo identification, when they were requested by Officer Heim.  Once it was established that Galindo-Diaz could not provide evidence of his identity or authority to drive the vehicle, Officer Heim was justified in requesting identifying information from Appellant.  Cf. United States v. Galindo-Gonzales, 142 F.3d 1217, 1224 (10th Cir. 1998) ("[W]e have concluded that officers confronted with a motorist who cannot produce proof of ownership may ask questions about the identity and travel plans of the driver and passengers.").  This is not to say that Officer Heim immediately should have been able to question Appellant on matters irrelevant to the scope of the vehicle stop, but only that he was allowed to ask Appellant for his name and the name of the driver, as well as the connection between, and travel plans, of the two men.  When Appellant was asked for his name and that of the driver, Galindo-Diaz, Appellant told Officer Heim that Galindo-Diaz was his brother-in-

law, but that Appellant did not know his name. Officer Heim then asked Galindo-Diaz for Appellant's name, and Galindo-Diaz stated that he did not know it. To further complicate the men's story, Appellant claimed that he, his wife and Galindo-Diaz had all stayed together the night before at a hotel. Galindo-Diaz, on the other hand, stated that he lived in Kansas City and had stayed at home the night before. Finally, both men demonstrated a reluctance to answer questions that might have been the result of language difficulties, but might also have been an attempt at concealment.

Once Officer Heim received these dubious and inconsistent answers to his questions, he developed reasonable, articulable suspicion that the two men might be engaged in criminal activity, thereby justifying their continued detention for further investigation. We have held that implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity. See United States v. Kopp, 45 F.3d 1450, 1453-54 (10th Cir. 1995). We have also stated that courts should "defer to 'the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'" United States v. McRae, 81 F.3d 1528, 1534 (10th Cir. 1996) (quoting United States v. Martinez-Cigarroa, 44 F.3d 908, 912 (10th Cir. 1995) (Baldock, J., concurring)). In this case, the contradictions, implausibilities and potentially evasive actions of Appellant and

Galindo-Diaz would cause an experienced officer to become suspicious that the men were engaged in criminal activity.

We therefore conclude that Officer Heim did not exceed the scope of the traffic stop by detaining Appellant and Galindo-Diaz in order to further investigate potential criminal activity for which he had developed reasonable, articulable suspicion in the course of his questioning.

C.  The district court correctly concluded that Zubia-Melendez freely and voluntarily consented to the search of his car

It is well-established that warrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement. See United States v. Karo, 468 U.S. 705, 717 (1984).  "[T]he government has the burden of proving that an exception to the warrant requirement applies."  United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993); see also United States v. Pena, 143 F.3d 1363, 1366 (10th Cir. 1998) (holding that the government has the burden of proving voluntary consent to conduct a warrantless search).   Consent is one such exception to the warrant requirement, see Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), and this court has therefore held that a vehicle may be searched if a person in control of the vehicle has given his voluntary consent to the search, see United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994).

- 14 -

Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances and reviewed for clear error. See United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994). We have utilized a two-part test to make this determination: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion." See McRae, 81 F.3d at 1537 (quoting United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995)).

The conversation in which Officer Heim handed Galindo-Diaz the warning ticket and requested consent to search the vehicle occurred off-screen in the videotape, but it appears that the vehicle registration documents were returned to Galindo-Diaz at that time. Officer Heim then approached the Appellant, who was still sitting in the passenger's seat in the vehicle. The officer asked to search the vehicle for drugs and Appellant, who did not speak good English, replied, "No, never." The officer then asked again to search the vehicle and Appellant replied "Yeah, no matter."

We acknowledge that the issue of whether Appellant's consent was freely and voluntarily given is a close one. When he was first asked for consent to search the vehicle, Appellant refused. The fact that Appellant initially told

- 15 -

Officer Heim he could not search the car does not, however, render his subsequent consent involuntary, cf. United States v. Flores, 48 F.3d 467, 468-69 (10th Cir. 1995) (holding that the defendant's hesitation before opening the trunk of her car did not make her subsequent consent involuntary), especially because Appellant's consent appears to have come without hesitation when he was asked a second time for permission to search the vehicle.

The next question, then, is whether Appellant truly understood Officer Heim's question before giving his consent. We acknowledge that Appellant has trouble speaking and understanding English; the videotape of the traffic stop demonstrates his confusion at several points during the encounter, and he testified at the suppression hearing with the assistance of an interpreter. Appellant admitted at the suppression hearing, however, that he understood the officer's request for his name, identification, and ownership of the vehicle. Indeed, the district court specifically found at the suppression hearing that Appellant and Officer Heim "could converse sufficiently to understand one another, both with respect to Mr. Zubia's understanding of what was said to him in English and also what was said by Trooper Heim in the few Spanish words that he used." We do not find the district court's conclusion in this regard to be clearly erroneous, and therefore find that Appellant had sufficient familiarity with the English language to understand and respond to Officer Heim's request. Cf. United States v. Corral,

899 F.2d 991, 994 (10th Cir. 1990) (holding that defendant with limited knowledge of English voluntarily consented because he understood the officer's questions, answered questions in English and demonstrated an overall working knowledge of English).

Finally, we find no error in the district court's conclusion that Appellant's consent to the search was not explicitly or implicitly coerced by Officer Heim and was therefore voluntary. Officer Heim neither told Appellant that he was free to leave nor informed him that he could refuse consent, and we have held that both factors should be considered in determining whether consent was voluntary. See Gregory, 79 F.3d at 979. In addition, at the time consent was given, Appellant had been detained for approximately eleven minutes, had been frisked once, and was sitting in the passenger seat of a vehicle that he could not drive away because he had neither keys nor a driver's license. But our review of the videotape of the traffic stop reveals no physical or verbal coercion by Officer Heim. In addition, Appellant's answer, "Yeah, no matter," when asked a second time for permission to search the vehicle was given without hesitation, and Appellant did not at any time attempt to stop Officer Heim from continuing his search of the vehicle.

In reviewing the totality of the circumstances, we cannot conclude that the district court clearly erred in finding that Appellant's consent to search the vehicle was freely and voluntarily given.

## CONCLUSION

For the foregoing reasons, we find that the district court did not err in denying Appellant's motion to suppress evidence seized during the search of his vehicle. The district court is therefore AFFIRMED.