**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

RAMON MARTINEZ, a/k/a Eidi
Burciaga-Orosco,

    Defendant-Appellant.

No. 06-1226

(D.C. No. 04-CR-00429-MSK)

(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **MCCONNELL**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.[**]

A jury found Defendant Ramon Martinez guilty of distributing or aiding and abetting

the distribution of 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841

and 18 U.S.C. § 2; and conspiracy to commit the same in violation of 21 U.S.C. § 846. The

district court sentenced Defendant to 360 months imprisonment. Prior to trial, Defendant

filed two motions to suppress. Defendant's first motion sought to suppress large sums of

cash uncovered during a traffic stop. Defendant's second motion sought to suppress

---

[*] This order and judgment is not binding precedent except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument.

incriminating conversations the Government recorded pursuant to a wiretap. The district court denied both motions. Defendant argues on appeal the district court erred because (1) the officer lacked reasonable suspicion to detain him beyond the time necessary to issue a citation, and thus his consent to search the vehicle was the fruit of an unlawful detention; and (2) the Government failed to establish the wiretap was necessary as required by statute. We have jurisdiction under 28 U.S.C. § 1291. Finding no reversible error, we affirm.

I.

The historical facts are not in dispute. On January 28, 2004, agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) and officers from the Colorado Springs Police Department arrested Adelaida Meza-Chaidez following a controlled purchase of methamphetamine. At the time of her arrest, Meza-Chaidez possessed approximately 580 grams of methamphetamine and $2,806 in cash. Officers also seized a ledger containing names and phone numbers of suspected drug customers and suppliers. In exchange for immunity from prosecution in federal court, Meza-Chaidez agreed to cooperate with law enforcement. Meza-Chaidez identified Defendant as the owner of the drugs. She explained Defendant operated a large drug-trafficking organization that transported methamphetamine and cocaine from Phoenix, Arizona to Colorado Springs and Denver, Colorado. She also consented to record telephone calls to Defendant.

In an unusual turn of events, on February 2, 2004, Thomas Neve, an officer with the Arizona Department of Public Safety, was patrolling Interstate 40 westbound in Coconino County, Arizona, when he observed a pickup truck that appeared to have excessively dark

2

tinted windows. Officer Neve could not see any occupants in the vehicle, which caused him to believe the windows "were way too dark" and in violation of Arizona law. He proceeded to stop the truck. Officer Neve approached the driver, later identified as Defendant, and asked for his driver's license, registration, and insurance. Defendant produced a Mexican driver's license identifying him as Osma Galaviz, and a vehicle registration showing the truck was registered in Des Moines, Iowa, under another person's name.

Officer Neve asked Defendant to step out of the truck and wait by his patrol car. Officer Neve then proceeded to question Defendant's passenger, Christina Alvarado, about the nature of the trip. Alvarado responded they were on their way to visit Defendant's sister *Elsa*, and that she lived at 20th *Street* and Indian School in Phoenix. Alvarado further stated she lived with Defendant in Albuquerque, New Mexico. Using a window-tint meter, Officer Neve tested the window's tint. The tint was three percent, an amount exceeding the darkness Arizona law allows.

While preparing the citation, Officer Neve questioned Defendant about the nature of the trip. Defendant told Officer Neve they were on their way to visit his sister *Chris*. Defendant told Officer Neve his sister lived at 20th *Avenue* and Indian School in Phoenix. Defendant further stated he lived in Iowa. Defendant's response struck Officer Neve as odd because it was inconsistent with Alvarado's statements. While Defendant and Alvarado provided slightly differing addresses for Defendant's sister's home, Office Neve testified this was significant because the addresses were on opposite sides of Phoenix. Officer Neve ran the status of Defendant's Mexican driver's license in Arizona, New Mexico, and Iowa, but

3

found no records. Suspicious, Officer Neve called for a backup unit.

When Officer Neve finished writing the citation, he handed the citation to Defendant along with his driver's license and vehicle registration. Officer Neve then asked Defendant if he had any large sums of cash, weapons, or illegal drugs. Defendant initially stated he did not, but then corrected himself by stating he only had cash for gas and travel. Defendant consented to a search of the truck and signed a Spanish-language consent form. Defendant spoke in Spanish but seemed to understand Officer Neve. Officer Neve communicated with Defendant in both Spanish and English. Prior to searching his truck, Officer Neve patted down Defendant as a safety precaution. Officer Neve noticed bulges in Defendant's front pockets. When asked about the nature of the bulges, Defendant responded it was cash. Defendant pulled the cash from his pockets and told Officer Neve it was "about $4,000." Officer Neve took the cash and placed it in the windshield of his patrol car so Defendant could see it.

During the search, Officer Neve found a handgun inside Alvarado's purse. Officer Neve arrested Alvarado for possession of a concealed weapon and placed her in the back of the patrol car. For safety reasons, Officer Neve handcuffed Defendant, but explained to him he was not being arrested. Around that time, Officer Joe Lapre and his dog arrived at the scene. Officer Lapre took the cash that Officer Neve had recovered from Defendant and placed it underneath the hood of the truck. Officer Lapre then walked his dog around the truck. The dog detected a scent of drugs in a duffle bag in the bed of the truck. A search of the bag uncovered another $4,000 in cash. The dog also alerted to the cash under the hood

4

of the truck. Officer Neve removed Defendant's handcuffs and asked him to follow him back to the highway patrol office. At the office, Officer Neve initiated forfeiture proceedings on the money. Officer Neve also issued Alvarado a citation for misdemeanor possession of a firearm and released her. Officer Neve returned $50 to Defendant for travel expenses, and allowed Defendant and Alvarado to go on their way.

During the search of the truck, Officer Neve also recovered four cell phones. He wrote down the numbers listed as ingoing and outgoing calls, and turned the information over to the Federal Drug Enforcement Administration (DEA). Agent John Preeg, the lead DEA agent in this case, noticed one of the phone numbers matched a number recovered from Meza-Chaidez's ledger. Meza-Chaidez had identified the number as belonging to Defendant.

After further attempts to use Meza-Chaidez in the investigation into Defendant's drug distribution ring failed, Agent Preeg applied for a wiretap authorization for two phone numbers purportedly belonging to Defendant. Agent Preeg submitted an affidavit in support of the wiretap in which he explained that normal and routine investigative techniques would be ineffective. Where such techniques had been used, he explained, they either failed entirely or had limited success, thus failing to achieve the full objectives of the investigation. He further explained traditional techniques were unlikely to succeed if tried or were too dangerous to implement. Following a hearing, on March 10, 2004, the district court granted the application reasoning "that an interception is necessary in this case" because "it appears that there is no other way to get the necessary information that [the Government] require[s] under the statute other than with an interception." The district court extended the application

5

on April 9, 2004 and again on May 7, 2004. Following the investigation, a grand jury indicted Defendant.

## II.

In challenging the denial of his motion to suppress the cash uncovered during the stop of his vehicle, Defendant does not argue Officer Neve lacked reasonable suspicion to detain him based on Officer Neve's observation of a traffic violation. See e.g. United States v. Bostero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation."). Rather, Defendant argues Officer Neve unlawfully detained him beyond the time it took to effectuate the purpose of the stop. According to Defendant, Officer Neve lacked reasonable suspicion of criminal activity to continue detaining him after Officer Neve returned his paper work and issued him a citation. Consequently, Defendant argues his consent to search the truck was the fruit of an unlawful detention.

A traffic stop is a seizure within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." Delaware v. Prouse, 440 U.S. 648, 653 (1979). A traffic stop is reasonable if (1) the officer's action was justified at its inception, and (2) the officer's action was reasonably related to the circumstances which justified the stop in the first place. See United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). We review a district court's determination of reasonableness de novo. See Rosborough, 366 F.3d at 1148.

6

An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation. See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001). Once an officer completes these tasks, the officer must allow the driver to proceed on his way without being subject to further delay by police for additional questioning. See id.; see also United States v. Edgerton, 438 F.3d 1043, 1047 (10th Cir. 2006). Absent a consensual encounter, further detention for purposes of questioning unrelated to the initial traffic stop is permissible if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring. See Zubia-Melendez, 263 F.3d at 1161. Reasonable suspicion exists where an officer has a "particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). We determine whether reasonable suspicion exists from the totality of the circumstances. See id.

We agree with the district court that Officer Neve developed reasonable suspicion during the traffic stop to justify Defendant's continued detention after he returned Defendant's paperwork and issued him a citation for excessive window tinting. We have previously held that contradictory answers to an officer's questions can contribute to reasonable suspicion of illegal activity. See, e.g., Zubia-Melendez, 263 F.3d at 1162 (reasonable suspicion existed where passenger and driver did not know each other's name and provided inconsistent answers regarding where they had spent the night). See also United States v. Wallace, 429 F.3d 969, 976 (10th Cir. 2002) (reasonable suspicion present where the driver and passenger gave the officer inconsistent answers regarding their

7

relationship and the type of motorcycle they were transporting). Undoubtedly, some of the factors Officer Neve cited as making him suspicious may, standing alone, be dismissed as innocent or susceptible to varying interpretations. Nevertheless, a "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." Arvizu, 534 U.S. at 277. When determining whether a detention is supported by reasonable suspicion, we must "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." Zubia-Melendez, 263 F.3d at 1162; see also Arvizu, 534 U.S. at 273-74 (noting officers may draw from their own experience and specialized training to make inferences that may very well elude an untrained person). Slightly conflicting answers, such as those Defendant and Alvarado gave to Officer Neve, may establish a particularized and objective basis for reasonable suspicion, notwithstanding that each of the factors alone is susceptible to innocent explanation. See Arvizu, 534 U.S. at 277; see also United States v. Sokolow, 490 U.S. 1, 9 (1989) (holding a factor may contribute to reasonable suspicion even where it "is not by itself proof of any illegal conduct and is quite consistent with innocent travel"). The inconsistencies, seen through the eyes of a trained law enforcement officer, support a finding of reasonable suspicion and justified Defendant's prolonged detention. Because Defendant voluntarily consented to a search of his truck while lawfully detained, no basis exists for suppressing the evidence uncovered during the search.[3]

---

[3] Defendant also argues Officer Neve violated his Fourth Amendment rights when the officer unreasonably prolonged the traffic stop by conducting additional investigation

III.

Defendant also challenges the district court's order denying his motion to suppress conversations the Government recorded pursuant to a wiretap. He argues the affidavits in support of the wiretap application and subsequent extensions did not establish a necessity for the wiretap as required under Title III of the Omnibus Crime Control and Safe Streets Act of 1968. See 18 U.S.C. §§ 2518(1)(c), 2518(3)(c). More specifically, Defendant argues the affidavits failed to state with particularity why the Government did not pursue traditional investigative techniques, but instead, contained boilerplate language that could be applied to all drug conspiracy cases. We review for an abuse of discretion a district court's determination a wiretap is necessary. See United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 (10th Cir. 2002).

---

unrelated to the window tint. According to Defendant, the "undisputed facts" establish that writing a citation for illegal window tinting would have taken six minutes, but that in this case Officer Neve took twice that long because of the officer's decision to conduct an investigation unrelated to the purpose of the stop. The record, however, does not support Defendant's argument. The record shows that upon stopping Defendant, Officer Neve obtained Defendant's driver's license, registration, and insurance papers; ran the status of Defendant's license and the vehicle's registration; measured the tint level of the truck's window; and discussed with Defendant and Alvarado their travel plans. As he did these things, he completed writing the citation. Officer Neve did not conduct any investigation unrelated to the purpose of the stop. As part of a routine traffic stop, an officer may "ask questions about the motorist's travel plans and authority to operate the vehicle" in addition to obtaining a motorist's documentation, running a computer check, questioning a passenger about travel plans, and issuing a citation. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006). Presumably, had Officer Neve not verified Defendant's documentation or asked any questions he would have completed the citation sooner. Nevertheless, Officer Neve's conduct was related to the purpose of the traffic stop and sanctioned by our precedent.

An order authorizing a wiretap is presumed proper, and a defendant challenging its authorization bears the burden of proving its invalidity. See United States v. Castillo-Garcia, 117 F.3d 1179, 1186 (10th Cir. 1997), *overruled on other grounds by* Ramirez-Encarnacion, 291 F.3d at 1221, n. 1. In order to obtain a wiretap, the Government must, among other things, show the wiretap is necessary. See 18 U.S.C. §§ 2518(1)(c), 2518(3)(c). The Government establishes necessity by showing "traditional investigative techniques have been tried unsuccessfully, reasonably appear to be unsuccessful if tried, or are too dangerous to attempt." Ramirez-Encarnacion, 291 F.3d at 1222. Where the Government does not implement traditional investigative techniques, it must explain why with particularity. See Castillo-Garcia, 117 F.3d at 1187-88. Traditional investigative techniques include (1) standard visual and aural surveillance; (2) questioning of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; (4) infiltration of conspiratorial groups by undercover agents or informants; and (5) pen registers and trap and trace devices. United States v. Vanmeter, 278 F.3d 1156, 1163-64 (10th Cir. 2002). We conduct our review of the Government's demonstration of necessity "in a practical and commonsense fashion" considering "all of the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap." Castillo-Garcia, 117 F.3d at 1187.

Having thoroughly reviewed the affidavits in support of the wiretap application and subsequent extensions, we agree with the district court the Government properly established a necessity for a wiretap. We need not recount here the Government's extensive description

10

of its efforts to implement the traditional investigative techniques described above, or its explanation as to why some of these techniques would not aid in the investigation. Suffice it to say, the forty-seven page affidavit in support of the application and the affidavits in support of the extensions explain with sufficient detail the investigative efforts the Government undertook and explain with particularity the reasons why the Government did not pursue certain traditional investigative techniques.

Defendant has randomly quoted portions of the affidavits in arguing the affidavits contain boilerplate statements applicable to the vast majority, if not all, drug conspiracies. Unsurprisingly, however, many drug conspiracies share similar characteristics and their investigation presents similar difficulties for law enforcement. Generalities alone "are insufficient to support a wiretap application." Castillo-Garcia, 117 F.3d at 1188. But generalities "can be made so long as they are accompanied by specific information about how these generalities apply to the particular suspects and/or particular investigation." United States v. Mascarenas, 30 Fed. Appx. 784, 794, n. 10 (10th Cir. 2002) (unpublished). To the extent the Government's affidavit contains some generalities, these generalities are accompanied by information pertinent to this investigation.

By way of example, Defendant points out the Government rejected the use of undercover agents as unlikely to be fruitful because, in the words of the Government, "drug traffickers do not like to introduce associates to their suppliers." Defendant argues such generalities apply to all drug conspiracies and are insufficient to support a finding of necessity. The affidavit, however, says much more in this regard. The affidavit provides a

11

description of how Defendant's drug-trafficking operations worked in Colorado, and explains that Defendant only did business with a few individuals who had been in the organization for a long time. The affidavit goes on to explain the difficulties associated with an attempt to infiltrate Defendant's operation. In particular, the affidavit explains that if an undercover agent were introduced, a relationship other than that of a drug buyer to drug seller would unlikely exist, and that Defendant probably would not share information about suppliers with a street-level buyer. Contrary to Defendant's argument, the affidavit explains in more than generalities that the tight-knit nature of Defendant's operation made infiltration into the conspiracy impracticable.[4] The Government's affidavits sufficiently established necessity as defined by the wiretap statute and understood by our precedent. Therefore, no basis exists for suppressing the recorded conversions.

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
Circuit Judge

---

[4] Defendant also argues the Government used minimal investigative efforts before seeking a wiretap. Defendant argues, for example, that the Government should have attempted to infiltrate the organization through the use of undercover agents. We have explained, however, that "the government need not exhaust . . . every conceivable investigative technique before resorting to wiretapping." Castillo-Garcia, 117 F.3d at 1188. Rather, we have "required the government to prove exhaustion–either by attempt or explanation of why the method would not work–of all reasonable investigative methods." Id. The Government met its obligation in this case.

12