**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 10, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

EUSEBIO GUERRERO-SANCHEZ,

    Defendant-Appellant.

No. 10-3061
(D.Ct. No. 6:09-CR-10111-WEB-1)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BRORBY**, and **GORSUCH**, Circuit Judges.

Appellant Eusebio Guerrero-Sanchez pled guilty to one count of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). In pleading guilty, Mr. Guerrero-Sanchez reserved his right to challenge the district court's ruling denying his motion to suppress evidence. He now appeals, claiming a violation of his Fourth Amendment right against unreasonable search and seizure during a traffic stop. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm Mr. Guerrero-Sanchez's conviction.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I. Factual and Procedural Background

The material facts surrounding Mr. Guerrero-Sanchez's traffic stop are largely outlined in the district court's memorandum and order on his motion to suppress and supported in the record provided on appeal. We recount only those facts necessary for consideration of the issues presented to this court.

Eduardo Padron is an English- and Spanish-speaking police officer with the Wichita, Kansas Police Department who is trained and certified as a police drug detection dog handler. His dog is trained and certified in the detection of several drugs, including heroin. On September 8, 2009, at approximately 3:30 p.m., Officer Padron was with his dog in his patrol car on Kellogg Street, which is part of U.S. Highway 54, when he noticed a pickup truck with Washington State license plates traveling eastbound slightly ahead of him. He observed the driver, Mr. Guerrero-Sanchez, fail to signal a lane change in violation of Kansas Statute § 8-1548. Based on this violation, Officer Padron stopped Mr. Guerrero-Sanchez.

During the stop, Officer Padron noticed Mr. Guerrero-Sanchez primarily spoke in Spanish, so he conversed with him in Spanish and no communication difficulty arose. Officer Padron explained the traffic stop stemmed from Mr. Guerrero-Sanchez's failure to signal and then asked to see his driver's license. When Mr. Guerrero-Sanchez produced his driver's license, Officer Padron noticed

he appeared extremely or unusually nervous, with his hand shaking and jaw twitching, which was elevated beyond the usual nervousness of a traffic stop. He also noticed two cell phones in plain view in the truck. Based on his training and experience, he knew drug couriers sometimes carry more than one phone.

During this time, Officer Padron did not see any luggage or other items in the truck cab or bed consistent with travel from Washington to Kansas.[1] Officer Padron then questioned Mr. Guerrero-Sanchez as to his travel plans, to which he replied he was on vacation, traveling from Washington to North Carolina to visit his brother, and planned to be gone from Washington four or five days, but if he found work in North Carolina he would take a job there. When Officer Padron pointed out that he appeared to lack luggage or other items consistent with a trip, Mr. Guerrero-Sanchez responded he would drive back to Washington and then return to North Carolina if he got a job. Officer Padron later testified he became suspicious Mr. Guerrero-Sanchez possessed drugs based on his: (1) excessive nervousness; (2) possession of two cell phones; (3) lack of travel items, including luggage; and (4) unusual travel plans, including the fact Highway 54 is an indirect route for travel from Washington to North Carolina and the implausibility of

---

[1] Officer Padron testified that he saw some articles of clothing but "not what would be consistent with a vacation or a long trip." He later testified that he did not see the underwear and socks in the back seat area of the vehicle until after a subsequent search.

taking only four or five vacation days for a trip which takes two days' travel each way, leaving little or no time at the destination.

In an effort to investigate such suspicious circumstances, Officer Padron asked Mr. Guerrero-Sanchez about his employment, to which he responded he worked at a nursery in Washington and produced a pay stub which had his employer's phone number on it. Officer Padron asked to see it and then asked if he could contact his employer, to which Mr. Guerrero-Sanchez agreed. On calling the nursery, Officer Padron learned Mr. Guerrero-Sanchez worked there but left a month earlier to travel to Mexico for a family emergency and failed to answer or return calls to reach him. Because this information contradicted Mr. Guerrero-Sanchez's information about his trip, Officer Padron contacted the El Paso Intelligence Center to obtain data on border crossings and learned the vehicle Mr. Guerrero-Sanchez occupied entered California from Mexico three days earlier but had been driven by someone named "Sergio."

Based on his belief Mr. Guerrero-Sanchez lied to him and his increasing suspicion of drug activity, Officer Padron asked Mr. Guerrero-Sanchez to get out of the vehicle so they could talk without Officer Padron being exposed to traffic. He then told Mr. Guerrero-Sanchez several things did not add up and pointed out the vehicle recently came into the United States through California. At that point,

Mr. Guerrero-Sanchez changed his story, saying he had been in Mexico because of family and came through California. When Officer Padron expressed his disbelief and indicated it appeared he had lied to him, Mr. Guerrero-Sanchez insisted he was honest and hardworking, he did not have anything to hide, and that Officer Padron could search the vehicle himself. According to Officer Padron, he questioned Mr. Guerrero-Sanchez in a conversational tone, and this discussion was not argumentative or otherwise based on intimidation.

Following Mr. Guerrero-Sanchez's suggestion he search the vehicle, Officer Padron returned his license and other documents.[2] In front of another police officer, Daniel Gumm, who had arrived on the scene, Officer Padron clarified with Mr. Guerrero-Sanchez whether he was willing to let the officers search the truck. Mr. Guerrero-Sanchez agreed, giving them permission to search it.

While searching the truck, Officer Gumm found a container of "Bondo," which is a substance used in auto-body work. From experience, Officer Padron knew drug couriers use Bondo to make trap doors or false compartments in

---

[2] While the district court indicated Officer Padron returned these items sometime during their prior discussion, Officer Padron testified he returned them after Mr. Guerrero-Sanchez suggested he search the vehicle. This factual discrepancy does not change our disposition upon appeal affirming the district court's denial of Mr. Guerrero-Sanchez's motion to suppress.

vehicles. At 4:19 p.m., during the search of the vehicle, another K-9-trained police officer, Chad Cooper, joined them and suggested Officer Padron use his dog to search the vehicle. At that time, Officer Padron worked his dog around the vehicle where it alerted twice to the front passenger wheel well or engine compartment. The officers then decided they had probable cause to continue to search the vehicle and moved it to a nearby parking lot out of safety concerns and to allow a more thorough search.

The officers continued the search for an extended period but could not locate any drugs or compartments. During this time, Officer Cooper used his dog, which also alerted to the front passenger-side panel. Eventually, after removing both the front passenger-side fender and a cowling from the front windshield area, they found a compartment containing packages wrapped in black plastic material which later tested positive for heroin. Approximately three hours elapsed between the time Officer Padron spotted the vehicle and Mr. Guerrero-Sanchez's arrest. It was also discovered that earlier in the day, at approximately 10:40 a.m., an Oklahoma law enforcement officer had also stopped Mr. Guerrero-Sanchez for a traffic violation, after which he consented to a search of his vehicle; a drug detection dog alerted to the same front passenger-side fender but the officer released him because a search turned up no contraband.

Following his arrest, a grand jury indicted Mr. Guerrero-Sanchez on one count of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). Mr. Guerrero-Sanchez filed a motion to suppress the evidence discovered in his truck, claiming, in part: (1) Officer Padron illegally stopped him; (2) an unlawful detention ensued based on both the length and scope of the stop; and (3) he did not voluntarily consent because he did not believe he was free to terminate the detention or object to the search of his vehicle.

The district court held a hearing on Mr. Guerrero-Sanchez's motion to suppress. Officers Padron, Gumm, and Cooper testified to the aforementioned circumstances surrounding the traffic stop and search. Officer Padron's testimony also refuted Mr. Guerrero-Sanchez's suggestion Oklahoma authorities, who had stopped Mr. Guerrero-Sanchez earlier, or any other law enforcement agency, caused him to initiate the stop. This testimony was corroborated by the Oklahoma officer who stopped Mr. Guerrero-Sanchez earlier in the day and another Kansas-based Drug Enforcement Agency officer.

In denying Mr. Guerrero-Sanchez's request to suppress the evidence found in his vehicle, the district court held the initial stop was constitutional based on Officer Padron's observation of his failure to signal a lane change in violation of Kansas law. It also held the totality of the circumstances, including Mr.

Guerrero-Sanchez's unusual travel plans, possession of two cell phones, and excessive nervousness, supported a reasonable suspicion of criminal activity, justifying a brief detention to investigate the purpose of his trip and whether it constituted a cover for some illicit purpose such as drug trafficking. In addition, it determined the totality of the circumstances showed Mr. Guerrero-Sanchez voluntarily gave consent for a search of his vehicle, regardless of whether he was detained at the time his consent was given, and that no improper duress or coercion occurred because Officer Padron did nothing more than question inconsistencies in his stories. Once Officer Padron's dog alerted to the vehicle, the district court determined, police officers had probable cause to believe it contained illegal drugs for the purpose of continuing Mr. Guerrero-Sanchez's detention and searching his vehicle. Finally, it held the dismantling of the vehicle and the entirety of the length of the search were reasonable, given "the way the drugs were effectively hidden in the vehicle."

Following the district court's order, Mr. Guerrero-Sanchez entered a conditional guilty plea to one count of being in possession with intent to distribute heroin, reserving the right to appeal the district court's denial of his motion to suppress. Thereafter, the district court sentenced him to seventy months imprisonment and three years supervised release.

## II. Discussion

On appeal, Mr. Guerrero-Sanchez no longer challenges the reasonableness of the initial traffic stop. However, he continues to argue the scope and length of the stop were unreasonable. He claims Officer Padron deliberately and unreasonably prolonged the stop by interrogating him, both in and out of his vehicle, about his travel plans until he gave consent to search, which he claims constituted a "grossly disproportionate" detention for a traffic violation and which was unsupported by his nervousness, two cell phones, lack of luggage, or any inconsistencies in his answers to Officer Padron's questions. He further contends what appeared to be inconsistent information concerning his trip to Mexico and drive from California was merely additional information he inadvertently failed to give the officer.

Mr. Guerrero-Sanchez also contends he did not voluntarily consent to the search of his vehicle, but, instead, gave consent as a result of the duress or coercion caused by Officer Padron's arguing, interrogating, and badgering him at length about his travel plans; accusing him of lying; and forcing him to provide travel and employment information he was under no obligation to provide. He also alleges he was never free to leave because Officer Padron continued to retain his pay stub, license, and registration during the encounter. Finally, he argues the three-hour length of the stop and search and the extent of the dismantling of his

vehicle were unreasonable under the circumstances, where three officers and two dogs searched the vehicle while he was detained along the roadside for an extended period of time and was not free to go.

We begin with our standard of review on motions to suppress and the law applicable to traffic stops and searches. We review a district court's denial of a motion to suppress evidence in the light most favorable to the government and accept the court's factual findings unless clearly erroneous. *United States v. DeJear,* 552 F.3d 1196, 1200 (10th Cir.), *cert. denied*, 129 S. Ct. 2418 (2009). "We review de novo the ultimate determination of reasonableness under the Fourth Amendment, 'keeping in mind that the burden is on the defendant to prove that the challenged seizure was illegal ....'" *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004) (alteration and citation omitted). In considering such a motion, "[t]he credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *DeJear,* 552 F.3d at 1200. In addition, in reviewing a district court's ruling on a motion to suppress, we may affirm "'on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.'" *Harman v. Pollock*, 586 F.3d 1254, 1259 (10th Cir. 2009) (quoting *Lambertsen v. Utah Dep't of Corr.,* 79 F.3d 1024, 1029 (10th Cir. 1996)), *cert. denied*, 131 S. Ct. 73 (2010).

We analyze traffic stops under the principles pertaining to investigative detentions, as articulated in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968), making a dual inquiry of "whether the officer's action was justified at its inception" and whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place."  In this case, because Mr. Guerrero-Sanchez no longer raises the first inquiry on the reasonableness of the initial stop, we need not address it on appeal.  Focusing on the second *Terry* inquiry, we recognize that "[i]n the context of routine traffic stops, a law enforcement officer may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate." *Rosborough*, 366 F.3d at 1148.  We have held that "[f]urther detention is appropriate only if during the course of the traffic stop, (1) the officer develops an 'objectively reasonable and articulable suspicion' that the driver is engaged in some illegal activity, or (2) 'the initial detention ... becomes a consensual encounter.'" *Id.* (quoting *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996)).  Like the district court, we focus on the first inquiry regarding whether Officer Padron developed an objectively reasonable and articulable suspicion of illegal activity for the purpose of further detaining Mr. Guerrero-Sanchez.

In making such an inquiry, we have repeatedly held an officer's questions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop. *See United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005); *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001); *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). We have also held implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001). While such questions fall within the scope of a traffic stop, "citizens' legitimate privacy interests are protected in that they are not legally obligated to answer such questions, nor can an officer compel an answer to these routine questions." *Williams*, 271 F.3d at 1267.

In assessing whether an officer develops an objectively reasonable and articulable suspicion of illegal activity, we have held reasonable suspicion may arise from the "totality of the circumstances" presented in each case. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In addition, "[a] determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct." *Id.* at 277. Thus, behavior susceptible to innocent interpretation may create reasonable suspicion depending on the totality of the circumstances confronting an officer. *See Oliver v. Woods*, 209 F.3d 1179, 1187-88 (10th Cir. 2000). When determining if a detention is supported by reasonable suspicion, we

"defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Zubia-Melendez*, 263 F.3d at 1162 (quotation marks omitted).

In this case, it is evident the district court afforded great credibility to Officer Padron's description of the events and deferred to his trained ability to distinguish between suspicious and innocent behavior. It is also clear that during the initial traffic stop and prior to the return of any documents, Officer Padron asked Mr. Guerrero-Sanchez permissible, routine questions about his travel plans. Although he was not legally obligated to answer those questions, Mr. Guerrero-Sanchez voluntarily did so and gave answers which, together with Officer Padron's observations, caused Officer Padron to suspect, based on his training and experience, that Mr. Guerrero-Sanchez was engaged in illegal drug activity, warranting further investigative detention. As Officer Padron explained, Mr. Guerrero-Sanchez's implausible travel plans; unusual route of travel; apparent lack of luggage; possession of two cell phones, indicating a drug courier situation; and excessive nervousness caused him to suspect criminal activity. While possession of two cell phones and nervousness demonstrated by shaking hands or a twitching jaw might, by themselves, constitute innocent conduct, the totality of the circumstances, together with Officer Padron's training and expertise, led to an objectively reasonable and articulable suspicion of illegal

conduct for the purpose of detaining Mr. Guerrero-Sanchez, pending further investigation, and did not violate the Fourth Amendment.

In continuing the investigative detention, and given Mr. Guerrero-Sanchez's indication he might be looking for employment, Officer Padron reasonably asked Mr. Guerrero-Sanchez about his employment status, at which time Mr. Guerrero-Sanchez voluntarily provided the name and phone number of his employer in Washington and permission to contact that employer. Officer Padron then discovered he left over a month before to go to Mexico on a family emergency – a story sharply inconsistent with both the vacation and travel plans previously provided. This only heightened Officer Padron's suspicion the trip had an illicit purpose, warranting additional investigative detention of Mr. Guerrero-Sanchez to check border crossing information.

Once Officer Padron learned the same vehicle driven by Mr. Guerrero-Sanchez crossed the Mexico-California border three days before, driven by someone named Sergio, such information only continued to heighten Officer Padron's suspicion of illegal activity and again supported further investigative detention, including having Mr. Guerrero-Sanchez get out of the vehicle so they could talk without Officer Padron being exposed to traffic. *See Maryland v. Wilson*, 519 U.S. 408, 412, 415 (1997) (holding removal of a passenger from a

vehicle for security and safety reasons does not violate the Fourth Amendment during a *Terry* stop).

After Officer Padron told Mr. Guerrero-Sanchez he believed he was being untruthful and pointed out the same vehicle recently came into the United States through California, Mr. Guerrero-Sanchez changed his story, saying he had been in Mexico because of a family emergency and came through California – again, a sharp contradiction from his earlier statement he was vacationing for four or five days, traveling from Washington to North Carolina, and possibly looking for employment. Based on the totality of the circumstances, it is apparent that at each interval previously described Officer Padron had an objectively reasonable and articulable suspicion of illegal conduct sufficient to warrant further investigative detention and questioning of Mr. Guerrero-Sanchez beyond the time required for an initial traffic stop.

Under these circumstances, we also reject Mr. Guerrero-Sanchez's contention an illegal detention occurred during this period because Officer Padron never explicitly told him he was free to leave while they conversed. Given Officer Padron's continuing and heightened reasonable suspicion of illegal activity, Mr. Guerrero-Sanchez's additional detention for further investigation was justified. *See Zubia-Melendez*, 263 F.3d at 1162.

As to Mr. Guerrero-Sanchez's consent to search his vehicle, we have said "[w]hether voluntary consent [is] given is a question of fact, determined by the totality of the circumstances and reviewed for clear error." *Id.* We utilize a two-part test to determine voluntary consent, including whether the government proffered "clear and positive" testimony the consent was "unequivocal and specific and freely given" and it shows the consent was given without implied or express duress or coercion. *Id.*

In this case, as Mr. Guerrero-Sanchez contends, his consent came after Officer Padron questioned the inconsistency in his travel plans and expressed his disbelief as to Mr. Guerrero-Sanchez's version of those plans. However, given the number of inconsistencies presented, it was not unreasonable for Officer Padron, as part of his investigation, to question the truthfulness of Mr. Guerrero-Sanchez's statements, and as the district court concluded, Officer Padron did nothing more than question inconsistencies in his stories. Moreover, Officer Padron repeatedly testified he did not use any form of duress or coercion during such questioning, and the record shows Mr. Guerrero-Sanchez offered no contrary evidence at the suppression hearing.

In response to Officer Padron's questions, Mr. Guerrero-Sanchez insisted he was honest and hardworking, said he did not have anything to hide, and

offered to allow Officer Padron to search his vehicle. At that time, Officer Padron returned Mr. Guerrero-Sanchez's license and other documents and clarified whether Mr. Guerrero-Sanchez was still consenting to a search of his vehicle, to which he agreed. Nothing in the record indicates the consent was not freely given or that the officers in any way used implied or express duress or coercion in obtaining his consent. Thus, the district court did not err in concluding Mr. Guerrero-Sanchez voluntarily consented to the search of his vehicle.

After Mr. Guerrero-Sanchez gave consent to search the vehicle, Officer Padron, knowing the container of Bondo found in the vehicle is often used by drug couriers to make false compartments in vehicles, used his dog to sniff the exterior of the vehicle. We have held a canine sniff on the exterior of a vehicle during a lawful traffic stop and detention does not implicate legitimate privacy interests. *See United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005). Moreover, as the district court indicated, once the dog alerted to the front passenger side of the vehicle, police officers had probable cause to believe it contained illegal drugs for the purpose of continuing the search and moving the truck to a nearby parking lot for safety reasons. *See id.* In addition, yet another drug detection dog alerted to the same area of the vehicle – only bolstering existing probable cause to continue the search. Once the officers found Bondo

-17-

and a dog alerted to the front passenger side of the vehicle, officers clearly had probable cause, not only to continue to search the vehicle, but to dismantle it as well. This is because evidence of a hidden compartment not only contributes to probable cause to search a vehicle but supports an officer's dismantling of a vehicle to find it. *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1261 (10th Cir. 2006). To the extent Mr. Guerrero-Sanchez is claiming he did not give consent for the transporting and dismantling of his vehicle or his consent did not extend that far, the officers here did not need such consent, given probable cause supported their actions. *See id.* (holding consent from suspect to move and dismantle car is unnecessary if probable cause exists to believe it contains contraband subject to seizure).

Finally, the record indicates the traffic stop and search lasted approximately three hours, which Mr. Guerrero-Sanchez claims is per se proof of the unreasonableness of the detention and search. However, no bright-line rule exists to definitively determine when the duration of a traffic stop and search is unreasonably long for the purpose of implicating the Fourth Amendment. Instead, as previously noted, we look to the totality of the circumstances presented in each case. Here, Mr. Guerrero-Sanchez's consent to search was shortly followed by a drug detection dog alerting to the vehicle, which occurred approximately forty-nine minutes after Officer Padron first noticed the vehicle. From this point,

-18-

probable cause arose supporting the continuation of the search, as well as the dismantling of the vehicle, until the contraband was found and seized, which took approximately two hours of time. However, as the district court determined, the entirety of the length of the search was reasonable, given "the way the drugs were effectively hidden in the vehicle." Based on the totality of the circumstances, the district court did not err in determining the length of Mr. Guerrero-Sanchez's detention and the search of his vehicle were reasonable under the Fourth Amendment.

## III. Conclusion

For the foregoing reasons, we **AFFIRM** Mr. Guerrero-Sanchez's conviction.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge