FILED
United States Court of Appeals
Tenth Circuit

December 18, 2007

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KENNETH LYONS,

      Defendant - Appellant.

No. 06-3111

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 03-CR-40144-01-RDR)**

Submitted on the briefs:

Eric F. Melgren, United States Attorney, and James A. Brown, Assistant United States Attorney, Topeka, Kansas, for Plaintiff - Appellee

Michael G. Highland, Bonner Springs, Kansas, for Defendant - Appellant.

Before **O'BRIEN, HOLLOWAY** and **HOLMES**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

      This case involves a vehicle stop, which led to the discovery of fifty-one pounds of cocaine hidden in the spare tire. Kenneth Lyons appeals from the

district court's denial of his motion to dismiss the indictment for want of a speedy trial and denial of his motion to suppress evidence. In his plea agreement, he waived his right to appeal from the resolution of the speedy trial issue and therefore we dismiss that portion of the appeal. His suppression issues (justification for the stop, continued detention after the stop, voluntariness of his consent to search and probable cause to search) are properly presented. We affirm with respect to the suppression issues.

## I. FACTUAL BACKGROUND

On December 11, 2003, at approximately 10:00 p.m., Kansas Highway Patrol Trooper Jarett Ranieri was parked in the median of Interstate 70 (I-70) in Greary County, Kansas. His vehicle faced Eastbound I-70. Trooper Andrew Dean was parked next to Ranieri. Both troopers had their vehicles' headlights on; there were no other lights on the roadway. Because Eastbound I-70 sits higher than the median, Ranieri and Dean were parked on an incline, causing their vehicles' headlights to illuminate the undercarriages of passing vehicles.

While parked in the median, Ranieri noticed a white Chevy Trailblazer. The body of the vehicle was dirty and salty but the spare tire attached to its undercarriage was clean and "didn't have a spec of road film on it at all." (R. Vol. 3 at 16.) Based on the difference in weather conditions between that day (clear and dry) and the previous one (snowy/rainy), Ranieri suspected the spare tire had been placed on the vehicle that day. He also suspected the tire might

contain contraband because in his experience spare tires are frequently used to hide drugs. Ranieri decided to follow the vehicle and run its license plate number.

Once Ranieri caught up with the vehicle, he noticed the license plate was so dirty it was unreadable. Moving closer, he was able to read the plate but not the expiration sticker. Ranieri also noticed the spare tire was hanging lower than normal. Because the dirty plate and tag violated Kansas traffic law (Kan. Stat. Ann. § 8-133) and based on his suspicions regarding the spare tire, Ranieri decided to pull the vehicle over. He activated his emergency lights.

Once the vehicle pulled over, Ranieri walked up to it from behind and wiped away the dirt covering the expiration tag and the name of the issuing state (Virginia) with his fingers. He then approached the driver's side window; Lyons was sitting in the driver's seat. Ranieri told Lyons that he had stopped his vehicle because its expiration tag was covered with dirt and unreadable and that he had cleaned the tag. Lyons and his passenger, Letty Sierra De Maldonado, informed Ranieri they had traveled to Denver, Colorado, for vacation and were heading back to Fort Lauderdale, Florida. Ranieri asked for Lyons' driver's license and the vehicle's registration. Lyons gave him his Florida driver's license and the vehicle's rental agreement. While standing at the driver's side window, Ranieri noticed two cellphones (which in his experience are used by drug traffickers to communicate) and a radar detector; he also smelt air freshener (which in his

experience is often used to mask the smell of drugs).

On the way back to his patrol car to verify Lyons' driver's license, Ranieri took a closer look at the spare tire, which was illuminated by his patrol vehicle's headlights. He noticed the rim was salty and dirty but the actual tire was clean. He also observed fingerprints on the tire and tool marks where the rim and tire meet. This raised Ranieri's suspicions that the tire had been placed on the rim that day. Ranieri further noticed the tire was a different brand and larger than the four tires on the vehicle.

Once in his patrol vehicle, Ranieri performed a criminal history check on Lyons and filled out a warning ticket. Ranieri learned Lyons had a criminal history involving drug possession and trafficking. He also noticed the rental agreement was two weeks overdue. While Ranieri was in his patrol vehicle, Trooper Dean approached. Ranieri informed him he believed the spare tire contained contraband and told him to look at the tire. Dean complied and confirmed Ranieri's suspicions that the tire had been removed from the vehicle and there was something in it.

Ranieri returned to the driver's side window and handed Lyons his driver's license, the rental agreement and the warning ticket. Once he returned the paperwork, Ranieri thanked Lyons and De Maldonado for their time and took a step back from the vehicle. De Maldonado then asked Ranieri where the nearest car wash was located; Ranieri took a step toward the vehicle and told them the

-4-

closest car wash was in Topeka. Ranieri stepped back from the car again. The following discussion ensued:

**Ranieri:** I was just going to ask you before you take off, I noticed you kind of have a history . . . of drugs and stuff, do you . . . have anything illegal in here . . . .

**Lyons:** No.

**Ranieri:** No type of illegal drugs or anything?

**Lyons:** No.

**Ranieri:** Can I look in, can I look in the back?

**Lyons/De Maldonado:** [Inaudible]

**Ranieri:** I was kind of wondering about that rental agreement, is that an old one? Or is it just . . . .

**Lyons:** I had it extended because . . . .

**Ranieri:** Oh, did you call and get it extended? Okay, well that makes sense then. But you wouldn't have anything illegal . . . in here . . . ?

Lyons: No, not at all, sir.

**Ranieri:** Any type of drugs, cocaine, marijuana, or anything like that?

**Lyons:** No.

**Ranieri:** Okay, can I look in the back, would you mind if I looked in the back?

**Lyons:** Go ahead.

**Ranieri:** Okay.

(R. Supp. Vol. II at 22:08:12-22:08:47.)

Ranieri went to the back of the vehicle to look for the tools to lower the spare tire. As he was searching for the tools, he discovered four cans of Fix-A-Flat Tire, which further raised his suspicions regarding the spare tire because he had never seen Fix-A-Flat Tire in a rental vehicle. That led him to believe Lyons and De Maldonado were concerned about getting a flat tire because the spare tire was inoperable. Unsuccessful in finding the tools to lower the spare tire, Ranieri retrieved a stethoscope from his patrol vehicle. He performed an "echo test" on the tire with the stethoscope, which involves hitting it with an object and noting the sound. (R. Vol. 3 at 34.) A normal tire will project a loud ring when hit whereas a tire with something in it will project a low thud. When Ranieri hit the tire with his ASP[1] baton, he heard a low thud.

Ranieri then asked Lyons if he knew where the tools to release the spare tire were located. Lyons stated he did not know. Ranieri eventually discovered the tools under the rear bench seat. Using the tools, Ranieri lowered the spare tire. When he did so the vehicle rose up indicating the tire was very heavy, reinforcing Ranieri's suspicion that drugs were hidden inside. Once the tire was lowered Ranieri pulled it from under the vehicle. It was extraordinarily heavy. Using a knife, Ranieri cut the tire open, discovering fifty-one pounds of cocaine.

The traffic stop was captured by the video camera in Ranieri's patrol

---

[1] ASP stands for Armament Systems and Procedures, Inc., a company which offers police officer training and products. *See* http://www.asp-net.com

vehicle. Although normally the camera begins recording when the vehicle's emergency lights are activated, the camera's videotape was stopped on another recorded traffic stop Ranieri had been watching before pulling over Lyons' vehicle. As a result, to avoid taping over the other traffic stop, the camera automatically fast-forwarded to a clean portion of tape before beginning to record in this case. Because of that delay the camera did not begin recording until after Ranieri was already at the driver's side window—after he had cleaned the license plate and expiration tag. The record is confounded by another problem. Although Ranieri wears a microphone, he forgot to activate it until he approached the vehicle the second time to return Lyons' paperwork. Therefore, the videotape has no audio until this time.

## II. PROCEDURAL BACKGROUND

Lyons was indicted for possession with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2 (Count I) and conspiracy to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(b)(1)(A), 846 and 18 U.S.C. § 2 (Count II). He filed a motion to dismiss the indictment, arguing the allegedly prejudicial delay between the filing of the indictment and the time he made his initial appearance violated his speedy trial rights. He also filed a motion to suppress evidence, claiming the stop of his vehicle, his subsequent detention and the search of his vehicle and its spare tire were all unlawful under

the Fourth Amendment.

The district court held a hearing on Lyons' motions; Ranieri was the only witness. The parties also submitted the videotape of the traffic stop and pictures of Lyons' vehicle taken after Lyons' arrest. The court denied both motions. Thereafter, Lyons pled guilty to Count II and was sentenced to 151 months imprisonment.

## III. DISCUSSION

Lyons complains of the district court's denials of his motions to dismiss the indictment and suppress evidence.

A. <u>Motion to Dismiss the Indictment</u>

Lyons was arrested after the traffic stop and indicted on December 17, 2003. He posted bond and then absconded. Lyons was re-arrested in Florida on September 18, 2004, transported to Kansas on October 29, 2004, but was not brought to court for his initial appearance until January 13, 2005, seventy-seven days later. Lyons claims this seventy-seven day delay violated his speedy trial rights under the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. The government claims Lyons waived the right to appeal this claim in his plea agreement. The government is correct.

In determining whether an appeal is precluded by a defendant's plea agreement waiver of appellate rights, we consider: "(1) whether the disputed appeal falls within the scope of the waiver . . . ; (2) whether the defendant

knowingly and voluntarily waived his appellate rights; and (3) whether enforcing the waiver would result in a miscarriage of justice." *United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004). A miscarriage of justice occurs when (1) the district court relies on an impermissible factor such as race, (2) ineffective assistance of counsel in connection with the negotiation of the waiver renders the waiver invalid, (3) the sentence exceeds the statutory maximum, or (4) the waiver is otherwise unlawful, *i.e.*, the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id.* at 1327.

In his plea agreement, Lyons waived his right to appeal any matter in connection with his prosecution, conviction and sentence except (1) "matters relating to suppression issues decided by the Court" and (2) an upward departure from the applicable guideline range. (R. Vol. 1, Doc. 43, Attached Plea Agreement at 2.) Lyons' challenge to the court's denial of his motion to dismiss the indictment does not fit within either of these exceptions and therefore it is within the scope of the waiver. *See United States v. Najera*, 87 Fed. App. 91, 93 (10th Cir. 2004) (unpublished) (concluding defendant's conditional plea agreement reserving his right to appeal his sentence and the denial of his motion to suppress did not reserve his right to advance any argument under the Speedy Trial Act).[2]

---

[2] Unpublished opinions are not binding precedent. 10th Cir. R. App. P. 32.1(A). We mention *Najera* as we would an opinion from another circuit, persuasive because of its reasoned analysis.

Lyons has not demonstrated his waiver was other than knowing and voluntary. In his opening brief he merely states he "reserv[ed] the right to appeal the post-indictment delay," which he did not. (Appellant's Br. at 3.) Moreover, he did not file a reply brief to respond to the government's waiver argument. *See United States v. Anderson*, 374 F.3d 955, 958-59 (10th Cir. 2004) (concluding defendant had knowingly and voluntarily entered into appellate waiver because he failed to claim otherwise on appeal).

Finally, we conclude enforcement of the waiver would not result in a miscarriage of justice. The district court did not rely on an impermissible factor, there is no claim defense counsel was ineffective in negotiating the waiver, Lyons' sentence did not exceed the statutory maximum of life imprisonment, *see* 21 U.S.C. §§ 841(b)(1)(A)(ii), 846, and there is no claim that the waiver is otherwise unlawful. Consequently, we enforce Lyons' waiver of appellate rights and dismiss his appeal from the denial of his motion to dismiss the indictment.

B. Motion to Suppress

Lyons argues the district court erred in denying his motion to suppress. He challenges the initial stop of his vehicle, his continued detention after Ranieri returned his license and other paperwork and the search of his vehicle and its spare tire. "In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). However, we review de novo the

ultimate determination of reasonableness under the Fourth Amendment. *Id.*

1. Initial Traffic Stop

Lyons argues the initial stop of his vehicle violated the Fourth Amendment. The district court concluded the initial traffic stop was lawful because Ranieri had a reasonable articulable suspicion that a violation of Kan. Stat. Ann. § 8-133 was occurring. We see no error.

A traffic stop is a seizure under the Fourth Amendment and must be objectively reasonable to pass constitutional muster. *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979); *see also United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999). In order to be reasonable, a traffic stop must be "justified at its inception." *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001) (quotations omitted). "[A] traffic stop is valid [at its inception] if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

Ranieri stopped Lyons' vehicle because its license plate was dirty and he could not read the expiration tag – a violation of Kan. Stat. Ann. § 8-133 which requires a vehicle's license plate to "be maintained free from foreign materials and in a condition to be clearly legible." *See State v. Hayes*, 660 P.2d 1387, 1389 (Kan. Ct. App. 1983) ("[T]he display of an illegible or obscured vehicle tag is a

-11-

violation of K.S.A. 8-133 even if the vehicle is duly licensed in another state.").[3]

Consequently, Ranieri was justified in stopping Lyons' vehicle because he had a reasonable articulable suspicion that a traffic or equipment violation was occurring.

Lyons' attempts to refute this conclusion are unavailing. Contrary to Lyons' arguments, Ranieri's testimony is not the only evidence establishing the license plate and expiration tag were dirty and unreadable. The district court found, and we agree, that pictures of the license plate taken after the incident support Ranieri's testimony that he wiped away the dirt covering the expiration tag and the name of the issuing state. But a lack of corroborating evidence would not necessarily be fatal.

Ranieri's testimony that the plate and tag were dirty and unreadable is sufficient, if credible. The trial court found it so and we see no reason to disturb the credibility determination. While Ranieri's failure to insure his patrol vehicle's video camera was recording when he wiped the dirty license plate could contribute to an adverse credibility finding, it is clearly insufficient to overturn a

---

[3] The plate and tag were not illegible due to the current weather conditions (the weather was clear and dry) or a factor outside Lyons' control. *See United States v. Edgerton*, 438 F.3d 1043, 1050-51 (10th Cir. 2006) (concluding no violation of Kan. Stat. Ann. § 8-133 occurs when the officer's inability to read a license plate or temporary registration tag is due to an external condition, *i.e.,* "snow, rain, fog, glare, or . . . an officer's poor eyesight," as opposed to a factor within the defendant's control, *i.e.*, mounting a license plate too low or leaving it covered with dirt).

favorable one. Also, the district court considered the equipment explanation sufficient and so should we. The same can be said about the government's failure to produce the warning ticket during discovery.[4] Ranieri testified he gave the warning ticket to Lyons and the court found Ranieri credible, possible contrary implications notwithstanding.

The trial court's ultimate conclusion, based upon the totality of the evidence, including credibility findings, was that Ranieri had reasonable, articulable suspicion for the stop. Giving full measure to Lyons' arguments (individually and collectively), we cannot say that conclusion was not justified.[5]

Moreover, because there was a violation of Kan. Stat. Ann. § 8-133, Ranieri could temporarily detain Lyons, while requesting his driver's license and vehicle registration, running a criminal history check and issuing him a warning ticket. *See United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007). Our decisions in *United States v. McSwain,* 29 F.3d 558 (10th Cir. 1994), and *United States v. Edgerton,* 438 F.3d 1043 (10th Cir. 2006)*,* are not to the contrary.

---

[4] No *Brady* violation is claimed or apparent. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

[5] Because Ranieri had reasonable suspicion to stop Lyons' vehicle under Kan. Stat. Ann. § 8-133, it is unnecessary to address Lyons' arguments challenging Ranieri's ability to observe from the median that the spare tire was cleaner than the rest of the vehicle, another potential justification for the stop.

In *McSwain*, an officer stopped McSwain's vehicle because he was unable to read the expiration date on its temporary registration sticker. Upon approaching the vehicle, he observed the sticker was valid and current. Nevertheless, the officer obtained McSwain's driver's license and vehicle registration, questioned him about his travel plans, ran a criminal history check and eventually received consent to search the vehicle. The search revealed drugs and a gun. McSwain argued that although the initial stop of his vehicle was proper, his subsequent detention was unreasonable. We agreed:

> [The officer] stopped Mr. McSwain for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker. Once [the officer] approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied. [The officer's] further detention of the vehicle to question Mr. McSwain about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification.

29 F.3d at 561.

In *Edgerton*, Trooper Dean stopped Edgerton's vehicle because he could not read its temporary registration tag. The tag was not unreadable due to any obstruction but solely because "'it was dark out.'" 438 F.3d at 1045. Once Dean approached the vehicle on foot with his flashlight, he had no difficulty reading the tag and determined it was valid. Nevertheless, Dean requested and obtained Edgerton's driver's license and vehicle registration, inspected the vehicle's undercarriage and issued Edgerton a warning ticket for violating Kan. Stat. Ann. § 8-133. After returning Edgerton's paperwork and issuing her the ticket, Dean

-14-

received permission to search the vehicle's trunk, eventually leading to the discovery of cocaine. While we rejected Edgerton's challenge to the initial stop of her vehicle, we concluded her continued detention even after Dean was able to read and discern the temporary registration tag's validity was unlawful:

> Once Trooper Dean was able to read the . . . tag and deem it unremarkable, any suspicion that [Edgerton] had violated § 8-133 dissipated because the tag was in "in a place and position to be clearly visible." At that point, *McSwain* instructs us for better or worse that Trooper Dean, as a matter of courtesy, should have explained to [Edgerton] the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration.

*Id.* at 1051.

The officers in *McSwain* and *Edgerton* were justified in stopping the defendant's vehicle based on a reasonable suspicion that a traffic violation was occurring but that suspicion evaporated once they observed no violation had occurred. Once their suspicion evaporated, the officers had no reason to continue to detain the vehicle or its occupants and therefore their subsequent actions (requesting the drivers' documents, running a criminal history check, inquiring about travel plans and seeking consent to search) were unlawful. This case stands in sharp contrast. Ranieri's suspicion for stopping Lyons' vehicle (illegible expiration tag) did not evaporate, but rather was confirmed, once he stopped Lyons' vehicle. Therefore, Ranieri's detention of Lyons while performing a license and vehicle registration check and issuing a warning ticket did not violate the Fourth Amendment. *See United States v. Ledesma*, 447 F.3d 1307, 1312-14

-15-

(10th Cir. 2006) (holding officer's detention and questioning of the defendant after stopping her vehicle because he did not observe a license plate were lawful; although officer was able to observe a registration tag once he stopped the vehicle, the tag was not displayed "in a place and position to be clearly visible" as required by Kan. Stat. Ann. § 8-133); *see also United States v. DeGasso*, 369 F.3d 1139, 1149 (10th Cir. 2004) (concluding the officer's detention of the defendant was lawful because the officer observed a continuing violation of state law after stopping the defendant's vehicle).[6]

2. Continued Detention

Lyons argues his continued detention after Ranieri returned his driver's license, the rental agreement and the alleged warning ticket was unlawful even if the initial stop was proper.

In addition to being justified at its inception, a lawful traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Williams*, 271 F.3d at 1266. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver may become unlawful if it is prolonged beyond the time reasonably required to complete that mission."

_____

[6] Even if the original purpose of the stop was satisfied prior to Ranieri questioning Lyons and requesting his driver's license and vehicle registration, it may well be that Ranieri's suspicions about the spare tire were enough to justify a license and registration check. *McSwain* and *Edgerton* involved no such additional facts. This issue is best left for another day since it is unnecessary to our decision.

-16-

*Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997) ("An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification."). Therefore, once an officer returns the driver's license and vehicle registration and issues a warning ticket, he must allow the driver to proceed without further detention or questioning unless the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity. *Karam*, 496 F.3d at 1161.

In determining whether an officer had reasonable suspicion to continue to detain a driver after returning the driver's paperwork and issuing a warning ticket, we look to "the totality of the circumstances to see whether the officer had a particularized and objective basis for suspecting legal wrongdoing." *United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) (quotations omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person." *United States v. Santos,* 403 F.3d 1120, 1134 (10th Cir. 2005) (quotations omitted). We give deference to "an officer's ability to distinguish between innocent and suspicious actions." *Williams*, 403 F.3d at 1207. "Reasonable suspicion, however, may not be derived from inchoate suspicions and unparticularized hunches." *Williams*, 271 F.3d at

-17-

1268.

The district court concluded that after the driver's license and other

paperwork were returned to Lyons, Ranieri had reasonable suspicion to believe

Lyons was engaged in illegal activity:

> Prior to the time that Trooper Ranieri returned defendant Lyons'[s] driver's license and other documents, he had an objectively reasonable suspicion that illegal drugs were being transported in [Lyons' vehicle]. He knew that the [vehicle] was a rental vehicle traveling east on I-70. He knew the spare tire was a different brand and a larger size than the tires on the four wheels. The spare tire looked suspiciously clean and appeared to be carried lower on the vehicle than normal. It had fingerprints and tool marks on it. Ranieri knew that spare tires are often used to smuggle drugs. He knew that defendant Lyons had a criminal history for drug possession and trafficking. In addition, Ranieri noticed a radar detector in the vehicle and thought he smelled air freshener.
>
> Under these circumstances, the court believes Ranieri had sufficient grounds to continue [Lyons'] detention to ask questions relevant to drug transportation and to request consent to search the vehicle.

(R. Vol. 1, Doc. 35 at 12-13.)[7] We agree that these factors, considered in their

totality, provided Ranieri reasonable suspicion to continue to detain Lyons.

Lyons does not challenge the existence of these factors or their relevancy to

the reasonable suspicion analysis. Rather, relying on *McSwain*, he asserts that

once Ranieri returned his paperwork to him and issued the alleged warning ticket,

---

[7] The district court also concluded Lyons consented to the continued detention and questioning. While an officer may lawfully detain a motorist for questioning unrelated to the initial stop if the motorist voluntarily consents, *see Karam*, 496 F.3d at 1161, because we conclude Ranieri had reasonable suspicion of criminal activity, we need not address whether the continued detention of Lyons was consensual.

the purpose of the stop was satisfied and any further detention was improper. *McSwain* is clearly distinguishable. There, once the purpose of the stop was satisfied by the officer verifying the validity of the temporary registration sticker, the officer had no further reason to continue to detain McSwain. Here, once the purpose of the stop was satisfied (issuing Lyons a warning ticket and returning his paperwork) Ranieri had reasonable suspicion of other criminal activity based upon his concerns about the spare tire. His continued detention of Lyons to facilitate further investigation of those suspicions was permissible.

3. Search of Vehicle and Spare Tire

Lyons argues the warrantless search of his vehicle, including its spare tire, violated the Fourth Amendment. The district court determined (1) the search of the back of Lyons' vehicle, including the visual examination of the spare tire, was justified by Lyons' unequivocal consent to Ranieri's request to "look in the back," (2) even if the scope of Lyons' consent did not extend to the visual examination of the spare tire, this examination did not require consent because it was not a search under the Fourth Amendment, and (3) Ranieri's lowering of the spare tire and cutting it open was justified by probable cause.

*a) Consent to Search*

Lyons claims his consent to search was not voluntary and even if it was, the search exceeded the scope of his consent.

(i) Voluntariness of Consent

-19-

In the district court, Lyons argued he never gave Ranieri permission to look in the back of his vehicle. He takes a different approach on appeal, claiming his permission to look in the back of the vehicle was not freely and voluntarily given. He asserts he felt extreme pressure to consent because of the presence of two police officers and his reluctance to provide consent is evidenced by the fact Ranieri had to repeatedly (actually, twice) ask for his permission to look in the back of the vehicle.[8]

Normally, we do not review issues raised for the first time on appeal. *United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. 2004). However, this rule is not jurisdictional and it is within our discretion to address an issue not raised in the district court. *United States v. Jarvis*, 499 F.3d 1196, 1201 (10th Cir. 2007). We generally only exercise this "in the most unusual circumstances." Our discretion allows us to determine an issue raised for the first time on appeal if it is a pure matter of law and its proper resolution is certain. *Id.* at 1202. While the determination of whether Ranieri's consent to "look in the back" was

---

[8] During his cross-examination of Ranieri at the suppression hearing, Lyons suggested Ranieri asked him five times to "look in the back." In addition to Ranieri's first request, "Can I look in, can I look in the back?," Lyons counts "Okay, can I look in the back, would you mind if I looked in the back?" as Ranieri asking for permission twice. We disagree. After Lyons' responds "go ahead," Ranieri asks Lyons for permission to pat him down and look in the vehicle's passenger compartment for weapons. In doing so, Ranieri says "if I look in the back" twice. Lyons attempts to count each of these statements as a request to "look in the back." It is apparent from the videotape, however, that Ranieri is merely explaining why he is requesting to perform a pat-down search and search of the passenger compartment for weapons.

voluntary is a question of fact, *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001), the issue has been fully briefed by the parties and the record is sufficiently developed.  In particular, the videotape of the stop shows the conditions under which Lyons consented.  Its proper resolution is certain.  Consequently, we exercise our discretion to address the issue.

"[W]arrantless searches violate the Fourth Amendment unless they fall within a specific exception to the warrant requirement." *Zubia-Melendez*, 263 F.3d at 1162.  Consent is one such exception and therefore, "a vehicle may be searched if a person in control of the vehicle has given his voluntary consent to the search." *Id.*  Whether voluntary consent was given is a question of fact determined by the totality of the circumstances. *Id.*  The government bears the burden of showing the consent was voluntary. *Id.*  To meet its burden, the government (1) "must proffer clear and positive testimony that consent was unequivocal and specific and freely given" and (2) "prove that this consent was given without implied or express duress or coercion." *Id.* (quotations omitted).

The videotape of the incident shows that Ranieri asked Lyons twice for permission to "look in the back." *See supra* at 5-6.  Lyons' response to the first request is inaudible but it appears Lyons did not directly respond to the request because whatever he said led Ranieri to ask him about the overdue rental agreement.  In any event, it is clear Lyons did not say "no."  However, when Ranieri asked him the second time, Lyons unequivocally responded "'go ahead'"

-21-

and unlocked the back door. (*Id.*; R. Vol. 3 at 71.) Nothing in the exchange suggests Lyons' grant of permission was involuntary. Indeed, the videotape shows Ranieri's manner and tone of voice when seeking permission to search was pleasant, not intimidating. *See Concepcion-Ledesma*, 447 F.3d at 1314-15 (stating an officer's pleasant manner and tone of voice are factors demonstrating voluntariness of consent). The fact Trooper Dean was also present does not affect our conclusion. While the threatening presence of multiple officers is a factor in determining whether an individual's consent is voluntary, *id.* at 1314, it is but one factor and there is no evidence Dean's presence was coercive or threatening. In fact, when Lyons gave Ranieri permission to search, Dean was standing on the other side of the vehicle.

(ii) Scope of Consent

Lyons argues that even assuming his consent was voluntary, the search exceeded the scope of his consent. Specifically, he asserts that when he gave Ranieri permission to look in the back of his vehicle, he had a right to believe Ranieri was only going to look in the back of the vehicle, not under it, and certainly not remove the tire and cut it open.

The scope of the consent determines the scope of the search. *United States v. Osage*, 235 F.3d 518, 520 (10th Cir. 2000). "In determining the scope of a defendant's consent, [the question is] what a reasonable person would have understood by the exchange between the defendant and police officer." *United*

-22-

*States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999). A "court determines from the totality of the circumstances whether a search remains within the boundaries of the consent, viewing the evidence in the light most favorable to the government." *West*, 219 F.3d at 1177. Generally, "where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle." *Id.* (quotations omitted).

Once Lyons consented to Ranieri "look[ing] in the back," Ranieri went to the back of the vehicle and began searching for the tools to lower the spare tire. He did not find the tools, but found four cans of Fix-A-Flat Tire. He then performed an "echo test" on the spare tire with a stethoscope. After performing the "echo test," he looked under the rear bench seat where he found the tools to lower the spare tire. We agree with the district court that Lyons' consent to Ranieri's request to "look in the back" allowed Ranieri to search the back of the vehicle and Lyons does not contend otherwise. Although the district court did not specifically address the issue, we conclude Lyons' consent also permitted Ranieri to look under the rear bench seat after performing the "echo test" on the tire. This conclusion is bolstered by Lyons' failure to object to Ranieri searching under the rear bench seat or otherwise attempting to limit the scope of his consent (and he had plenty of opportunity to do so while Ranieri was looking in the back of the vehicle and performing the "echo test").

-23-

We also agree with the district court that it is unnecessary to decide whether Lyons' consent to "look in the back" allowed Ranieri to visually examine the spare tire underneath the vehicle because such conduct does not constitute a search for purposes of the Fourth Amendment. *See United States v. Rascon-Ortiz*, 994 F.2d 749, 754 (10th Cir. 1993) (because the undercarriage of a vehicle is part of its exterior and not afforded a reasonable expectation of privacy, an officer's brief visual examination of it is not a search under the Fourth Amendment). However, the court's conclusion was limited to visual inspection of the tire and Ranieri did more than simply visually examine the spare tire; he also performed an "echo test," which required him to hit the tire while listening to it with a stethoscope. Nevertheless, we conclude this conduct was also within the scope of Lyons' consent.[9]

---

[9] Whether an "echo test" is a search presents a close and interesting issue. A search under the Fourth Amendment "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). It is clear there is no reasonable expectation of privacy in a vehicle's undercarriage. *Rascon-Ortiz*, 994 F.2d at 754. However, does this extend to a spare tire attached to that undercarriage, in particular, to the *contents* of that spare tire, which is the information gleaned from an "echo test"? *See United States v. Nicholson*, 144 F.3d 632, 639-40 (10th Cir. 1998) (although an individual may expect his personal luggage to be subject to certain contact by other passengers, he has a reasonable expectation that it will not be manipulated in such a manner as to reveal its contents and therefore officers' touching, pressing and manipulating of defendant's luggage in such a way as to determine if hard bundles were inside was a search). If there is a reasonable expectation of privacy in the contents of a spare tire, is an "echo test" nevertheless so minimally intrusive, and the information gleaned therefrom so limited, as to not rise to the level of a search? *See, e.g., United States v. Place*, 462 U.S. 696, 707 (1983) (finding dog sniff of luggage not a search due to its minimal intrusiveness and the

-24-

A reasonable person may have understood that Lyons consent to "look in the back" extended to Ranieri hitting the tire and listening to the resulting sound.[10] Regardless, Lyons did not object to an "echo test" or make any attempt to limit the scope of his consent at that time. His current objection is late blooming and convenient. His consent to "look in the back" rendered the entire rear portion of Lyons' vehicle, including the rear part of its undercarriage and the spare tire attached thereto, fair game for all that might be revealed to the senses. It may have extended further.

Lyons also claims his consent did not give Ranieri permission to remove the spare tire and cut it open. Because we agree with the district court that

---

limited information obtained therefrom). We need not decide this issue, however, because the scope of Lyons' consent extended to Ranieri performing the "echo test."

[10] Ranieri could have simply hit the spare tire and listened to the resulting sound without the stethoscope. We do not consider the use of a stethoscope significant under the circumstances. Use of such sense-enhancing devices by police officers generally does not affect the Fourth Amendment analysis. *Compare Texas v. Brown*, 460 U.S. 730, 739-40 (1983) (police officer's use of flashlight to illuminate interior of car and shifting of his position to obtain a better view of car's interior not a search) *and Rascon-Ortiz*, 994 F.2d at 755 (brief visual inspection of undercarriage of vehicle with flashlight and mirror not a search) *with Kyllo v. United States*, 533 U.S. 27, 34 (2001) ("We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area, constitutes a search -- at least where . . . the technology in question is not in general public use.") (quotations and citation omitted). The stethoscope merely enhanced sounds Ranieri could have heard (like *Brown* and *Rascon-Ortiz*) rather than revealed information he could not have otherwise obtained (like *Kyllo*).

Ranieri's removal of the spare tire and cutting it open were supported by probable cause, *infra § b)*, we need not address Lyons' argument that his consent did not extend to these actions. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1261 (10th Cir. 2006) (stating consent to search vehicle unnecessary where probable cause exists).

### b) Probable Cause to Search

Another exception to the Fourth Amendment's warrant requirement is the automobile exception. *United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002). Under this exception, an officer who has "probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *Id.* (quotations omitted). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). An officer has probable cause to search a vehicle if "under the totality of the circumstances there is a fair probability that the car contains contraband or evidence." *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004) (quotations and emphasis omitted). "In determining whether probable cause exists, an officer may draw inferences based on his own experience." *Id.* (quotations omitted).

The district court determined that Ranieri had probable cause to lower the spare tire on Lyons' vehicle and cut it open once he observed the cans of Fix-A-Flat

Tire and confirmed his suspicions that the spare tire contained contraband by performing the "echo test." We agree.

The spare tire on Lyons' vehicle was hanging lower than normal. While the rim of the spare tire was salty and dirty, the tire was clean. The spare tire also contained fingerprints and tool marks where the rim and tire meet. These facts suggested the tire had been placed on the rim, and, based on the difference in weather conditions between the day of the stop and the previous one, that the tire had been placed on the rim that day. The spare tire was a different brand and larger than the other four tires on the vehicle. The results of the "echo test" performed on the spare tire were consistent with the presence of contraband hidden therein. There were four cans of Fix-A-Flat Tire in the vehicle, which was unusual considering the vehicle was a rental. The presence of the Fix-A-Flat Tire in the vehicle also led Ranieri to the reasonable inference that Lyons was concerned about getting a flat tire because the spare tire was inoperable. When Ranieri lowered the spare tire, the vehicle rose up and when Ranieri pulled the tire from under the vehicle, it was extraordinarily heavy. These factors, as well as Ranieri's experience with drugs being transported in spare tires, demonstrate there was a fair probability that the spare tire contained contraband.

## IV. CONCLUSION

Based on Lyons' enforceable waiver of appellate rights, we **DISMISS** his appeal challenging the denial of his motion to dismiss the indictment. We

**AFFIRM** the district court's denial of his motion to suppress.