NOT DESIGNATED FOR PUBLICATION

No. 122,775

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

ANTHONY RAY MOSS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Riley District Court; KENDRA LEWISON, judge. Opinion filed December 4, 2020. Reversed and remanded with directions.

*David Lowden*, deputy county attorney, *Kelly G. Cunningham*, assistant county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Jeffery S. Adam*, of Robinson Firm, LLC, of Manhattan, for appellee.

Before POWELL, P.J., GREEN and STANDRIDGE, JJ.

PER CURIAM: This is the State's interlocutory appeal of the district court's order granting Anthony Ray Moss' motion to suppress evidence. Following a traffic stop, law enforcement discovered drugs and drug paraphernalia in Moss' vehicle. The district court granted Moss' motion to suppress, finding that although the officer had reasonable suspicion to stop Moss for an illegible license tag under K.S.A. 2019 Supp. 8-133, any reasonable suspicion dissipated once the officer approached the vehicle and could read the license tag. On appeal, the State argues that the officer's reasonable suspicion did not dissipate and that several other factors provided law enforcement with reasonable

1

suspicion that Moss was engaged in criminal activity, justifying his continued detention and warranting further investigation. For the reasons stated below, we reverse the district court's order of suppression and remand the matter for further proceedings.

FACTS

On the evening of August 6, 2019, Riley County Sergeant Nathan Boeckman was conducting surveillance on a known drug residence in southeast Manhattan. Law enforcement had been watching this residence for some time and had observed "stop and go traffic" from the rear of the residence, which was consistent with drug transactions. Boeckman observed a dark vehicle park directly behind the house in an alley and leave its headlights on. Suspicious of the vehicle, Boeckman exited his patrol car to get a better view of the alley. The vehicle was in the alley for three to four minutes. During this time, Boeckman saw no one from the vehicle enter or exit the house. As Boeckman stood on the side of the curb in full police uniform, he watched the vehicle drive up the alley and turn north, heading towards him. As the vehicle drove by, Boeckman observed the driver—later identified as Moss—raise his hand to cover the left profile of his face, an action Boeckman found suspicious. Boeckman also noted that the vehicle's 60-day temporary registration tag was illegible from about 15 feet away.

Boeckman contacted Riley County Police Officer Andrew Toolin, who also was conducting surveillance in the area, to request that Toolin intercept the vehicle. After the vehicle passed Toolin, he began following it. Toolin could not see any information on the license tag from a car-length distance. As a result, Toolin initiated a traffic stop. After Moss pulled the vehicle into a parking stall, Toolin saw Moss' body turn towards the center console back seat area while moving his right arm. Toolin was concerned that Moss was either concealing items inside the vehicle or retrieving a weapon. As Toolin approached the vehicle, he could not read the tag numbers on the license tag, or even tell

2

that it was a Kansas temporary tag, until he was about 5 feet away "at an angle off to the side of the vehicle."

Officer Toolin made contact with Moss, explained the reason for the stop, and requested Moss' driver's license and proof of insurance. Moss provided his driver's license and located a photograph of the vehicle's registration in a text message on his cell phone, but he was unable to provide any proof of insurance for the vehicle. Toolin ran Moss' information and learned that there was a warrant for Moss' arrest. Toolin also learned that Moss was required to have an ignition interlock device, but there was no ignition interlock device in the vehicle. As a result of the warrant, Toolin placed Moss under arrest. Toolin deployed his K9 partner on the vehicle, who alerted to the odor of illegal drugs near the front driver's side door. Toolin searched the vehicle and discovered a zipper pouch containing a large bag with 28.8 grams of a crystal substance inside, along with four smaller prepackaged bags, a digital scale, and four unused ziplock bags. Another pouch contained additional unused ziplock bags and two unused syringes. These items were located on the rear driver's floorboard directly behind the center console, the area Moss moved towards after he pulled over.

The State charged Moss with one count each of possession with intent to distribute methamphetamine, possession of methamphetamine, no drug tax stamp, and circumvention of ignition interlock, and two counts of possession of drug paraphernalia.

Moss moved to suppress the drug evidence discovered in his car, claiming the search violated his rights against unreasonable searches and seizures under the Fourth Amendment to the United States Constitution. Relying on *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006), and *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994), Moss argued that Officer Toolin unlawfully had detained him without reasonable suspicion of his involvement in any criminal activity. Moss asserted that because the reason for the stop dissipated after Toolin determined that the vehicle had a valid

3

temporary tag, Toolin improperly had extended the stop by questioning Moss and requesting documentation. As a result, Moss claimed that the drug evidence obtained as a result of the unlawful detention should be suppressed.

At a suppression hearing, the State presented testimony from Sergeant Boeckman and Officer Toolin. During his testimony, Boeckman admitted that law enforcement had been conducting pretextual stops of the vehicles leaving the drug house based on a hunch that they would find drugs. But Boeckman noted that the vehicles could not be stopped based on this hunch alone and that a valid traffic infraction was necessary to make a stop. Boeckman testified that when Moss' vehicle drove by him, he was unable to read the temporary license tag from 15 feet away. Boeckman explained:

> "The tag light was not fixed in the position where it would usually be fixed, you know, to the side or above. It was actually just dangling by a wire, so there was a bulb and a wire. The bulb is about the size of half of my pinky. It was just kind of sitting there, dangling. That wasn't necessarily the true obstruction.
> "The true obstruction was the fact that the tag was probably, I assume got wet at one point because it was really wrinkled. The best I can describe it is like just shriveled up bacon."

Officer Toolin testified about his observations of the license tag once he began following Moss' vehicle:

> "So I could tell that the tag had a clear plastic cover on it, something that's consistent with a 30-day or a 60-day tag, but I noticed that the license plate itself was wrinkled or folded up, creating distance between the plate and the actual cover. The tag light was swaying back and forth as it was a couple inches dropped down on to the tag making it illegible even at a car length behind it."

Toolin said that the condition of the tag violated Kansas statutes in two ways: (1) the tag numbers, the state, and the expiration date were not visible and (2) the tag light was not

4

properly affixed and instead was hanging down and obstructing the tag. Toolin described how the tag light obstructed the plate: "It caused a glare. Not only that, but it also—if you look directly on it, directly if you're maybe six inches from the plate it still obstructs portions of not only possibly the state or the numbers of the actual tag itself." Toolin said that he could not read the tag even when he was about a car length away or "much closer than what is considered to be a safe following distance."

After hearing testimony from Sergeant Boeckman and Officer Toolin and considering written and oral argument from counsel, the district court granted Moss' motion to suppress. The court held that Toolin had reasonable suspicion to stop Moss given the tag was illegible from a fairly short distance. But the court determined that any reasonable suspicion dissipated once Toolin was able to read the license tag within 5 feet of the vehicle as he approached it. The court rejected the State's argument that additional factors, including the vehicle stopping at the drug house and Moss hiding his face from Boeckman, constituted reasonable suspicion to believe that Moss was engaged in criminal activity. The court highlighted Boeckman's testimony, in which he said he did not believe these factors were sufficient to stop the vehicle in the absence of a traffic violation. And the court found that Moss' furtive movements after he pulled over did not warrant extension of the stop. Finally, the court declined to find reasonable suspicion based on an equipment violation due to the dangling tag light. The court reasoned that any evidence of an equipment violation was not well-developed in the State's motion or witness testimony. The district court judge concluded:

> "So with the Court's finding that the reasonable suspicion ended with Officer Toolin observing the tag, and seeing and being able to read the tag, that his only purpose at that point in time should have been to approach the defendant, advise him of why he had been stopped, and at that point in time if he developed no further reasonable suspicion, then Mr. Moss should have been allowed to go on his way.
> "I think the case law is clear that it is not permissible to ask for identification, for insurance, for registration at that point in time unless you've already—unless you have

5

reasonable suspicion. The only thing Officer Toolin was permitted to do would be to approach the vehicle and inform the driver of the reason for the stop, and that he was free to leave the scene.

"So I am granting Mr. Moss'[] Motion to Suppress."

The State filed this timely interlocutory appeal.

ANALYSIS

The State argues that the district court erred in granting Moss' motion to suppress. In support of its argument, the State claims Officer Toolin had reasonable suspicion to believe that Moss improperly displayed his license tag in violation of K.S.A. 2019 Supp. 8-133 and that Moss had a defective license tag light in violation of K.S.A. 8-1706(c). The State claims that Toolin's reasonable suspicion did not dissipate when he approached the vehicle and observed the tag. The State also alleges that, besides the license tag violations, several other factors provided Toolin with reasonable suspicion that Moss was engaged in criminal activity, justifying his continued detention and warranting further investigation.

The standard of review for a district court's decision on a motion to suppress has two components. An appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion, however, is reviewed using a de novo standard. In reviewing the factual findings, appellate courts do not reweigh the evidence or assess the credibility of witnesses. *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015) (applying standard of review to State's appeal after district court granted defendant's motion to suppress). Where, as here, the material facts supporting a district court's decision on a motion to suppress are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

6

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights contains similar language and provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). The detention of a driver, however brief, during the course of a routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *Edgerton*, 438 F.3d at 1047; *State v. Mitchell*, 265 Kan. 238, 241, 960 P.2d 200 (1998).

Because a routine traffic stop is more akin to an investigative detention than a custodial arrest, we analyze such stops under the principles developed for investigative detentions under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). To that end, a law enforcement officer must have reasonable suspicion—supported by specific, articulable facts—that a crime has been, is being, or is about to be committed. K.S.A. 22-2402(1) (codifying *Terry*); *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014). To determine the reasonableness of a traffic stop, we make a dual inquiry, asking first whether the law enforcement officer's action was justified at its inception, then second whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place. In other words, a traffic stop must last no longer than is necessary to effectuate the purpose of the stop. See *State v. Jimenez*, 308 Kan. 315, 323, 420 P.3d 464 (2018) (citing *Terry*, 392 U.S. at 20). "[W]hen a law enforcement officer has reasonable suspicion that a traffic violation has occurred, and that suspicion has not dissipated before the officer speaks with the driver, the officer is permitted to detain the driver, request a driver's license, run a computer check, and issue a citation, if appropriate." *State v. Diaz-Ruiz*, 42 Kan. App. 2d 325, 336, 211 P.3d 836 (2009) (citing *United States v. Lyons*, 510 F.3d 1225, 1236 [10th Cir. 2007]). But once an officer discovers that a traffic violation has not occurred, the officer must allow the driver to proceed without further delay. *McSwain*, 29 F.3d at 561-62.

Here, there is no dispute that the initial stop of Moss' car was lawful. K.S.A. 2019 Supp. 8-133, titled "Display of license plate," provides, in relevant part:

> "The license plate assigned to the vehicle shall be attached to the rear thereof and shall be so displayed during the current registration year or years. . . . Every license plate shall at all times be securely fastened to the vehicle to which it is assigned so as to prevent the plate from swinging, and at a height not less than 12 inches from the ground, measuring from the bottom of such plate, *in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible*." (Emphasis added.)

The "clearly visible" and "clearly legible" requirements of K.S.A. 2019 Supp. 8-133 apply to temporary registration tags. See *United States v. Poke*, 81 Fed. Appx. 712, 715 (10th Cir. 2003) (unpublished opinion). "Clearly legible," as that term is used in K.S.A. 2019 Supp. 8-133, means visible to a law enforcement officer following at a safe distance. *United States v. Orduna-Martinez*, 561 F.3d 1134, 1139 (10th Cir. 2009).

A review of the record supports the district court's finding that law enforcement had reasonable suspicion under K.S.A. 2019 Supp. 8-133 to stop Moss' vehicle. Both Sergeant Boeckman and Officer Toolin testified that Moss' temporary license tag was not clearly legible. Boeckman testified that he was unable to read the tag from 15 feet away because it was wrinkled and because the tag light was hanging down over the tag. And Toolin testified that the license tag was "wrinkled or folded up, creating distance between the plate and the actual cover." Toolin also noted that "[t]he tag light was swaying back and forth as it was a couple inches dropped down on to the tag making it illegible even at a car length behind it." These observations provided Toolin with reasonable suspicion to believe that Moss had committed a traffic infraction.

As for whether the resulting detention was justified, however, the district court found that the initial reasonable suspicion of criminal activity dissipated once Toolin got

8

close enough to read the license tag on Moss' vehicle. As a result, the court held that Toolin was only permitted to approach Moss, explain to him the reason for the stop, and advise him that he was free to leave the scene.

The Tenth Circuit Court of Appeals has issued several opinions involving traffic stops for license tag violations that are instructive to our analysis. In arguing for suppression of the drug evidence in this case, Moss relied on that court's decisions in *McSwain* and *Edgerton*. In *McSwain*, a Utah trooper stopped a Colorado vehicle on grounds that the temporary registration sticker was difficult to read because the expiration date appeared to be covered with reflective tape. But as the trooper approached the vehicle on foot, he verified the validity of the temporary sticker, and observed no violation of state law. Nevertheless, the trooper continued with some of the routine inquiries associated with a traffic stop and also conducted a criminal history check. Ultimately, the trooper requested and received consent to search the vehicle. The Tenth Circuit found that the detention of the vehicle's occupants became illegal after the stated purpose of the stop—checking the validity of the temporary registration sticker—was satisfied and the sticker was found to be valid. As a result, the court held that the trooper's actions in questioning the defendant and requesting his license and registration violated the Fourth Amendment. 29 F.3d at 561-62.

In *Edgerton*, a Kansas highway patrol trooper stopped a vehicle from Colorado at 2:30 a.m. because it was too dark to read the vehicle's temporary registration tag, which was posted in the rear window as required by Colorado law. After approaching the vehicle on foot, the trooper had no difficulty reading the tag and noted that it appeared valid. The trooper proceeded to inspect the undercarriage of the vehicle, issued a warning for a violation of K.S.A. 8-133, questioned the driver, and received consent to search the trunk. The Tenth Circuit held that the trooper's initial stop of the vehicle to ascertain the validity of the temporary tag in the back window constituted a permissible investigative detention of limited scope consistent with the Fourth Amendment. 438 F.3d at 1047-48.

But the court concluded that the trooper's actions exceeded the permissible scope of the detention in light of the stated justification for the stop. 438 F.3d at 1050-51. In reversing the district court, the Tenth Circuit determined that K.S.A. 8-133 did not criminalize a "wholly unremarkable" temporary registration tag simply because the defendant's vehicle was traveling at night, a condition that was outside the defendant's ability to control. 438 F.3d at 1050-51. The court held that once the trooper "was able to read the Colorado tag and deem it unremarkable, any suspicion that Defendant had violated [K.S.A.] 8-133 dissipated because the tag was 'in a place and position to be clearly visible.'" 438 F.3d at 1051. At that point, the court found that, consistent with *McSwain*, the trooper should have explained the reason for the initial stop and then allowed the defendant to leave without requiring her to produce her driver's license and registration. 438 F.3d at 1051.

The State argues that this case is factually distinguishable from *McSwain* and *Edgerton* and suggests that the facts here are more closely analogous to those before the Tenth Circuit in *Lyons*. There, a Kansas highway patrol trooper noticed that the defendant's vehicle was dirty and salty but had a clean spare tire attached to its undercarriage. The trooper suspected, based on his experience, that the spare tire might contain drugs. Additionally, the trooper could not read the expiration sticker on the vehicle's license plate. The trooper stopped the vehicle based on his suspicion about the tire and his belief that the dirty license tag constituted a violation of K.S.A. 8-133. As the trooper approached the stopped vehicle, he wiped the dirt off the tag before approaching the driver's side window and advising the defendant he had been stopped for an illegible tag. While obtaining the defendant's driver's license and registration documents, the trooper became more suspicious about the spare tire. After obtaining consent to search the vehicle, the trooper discovered 51 pounds of cocaine in the tire.

The Tenth Circuit affirmed the validity of the initial stop based on the trooper's reasonable suspicion of a violation of K.S.A. 8-133. Given the trooper's suspicion of a continuing violation of the statute, the court also concluded the trooper could temporarily

10

detain the defendant, request his driver's license and registration, run a criminal history check, and issue a warning ticket. 510 F.3d at 1234-35. The court distinguished *McSwain* and *Edgerton* because in each of those cases, the officers' stated reason in support of reasonable suspicion "evaporated once they observed no violation had occurred" and therefore the officers had no reason to detain the defendants to perform the tasks incident to an ordinary traffic stop. 510 F.3d at 1236. In contrast to the facts before it, the *Lyons* court noted that the trooper's suspicion that the defendant had an illegible tag "did not evaporate, but rather was confirmed, once he stopped Lyons' vehicle"; for that reason, the subsequent detention was lawful. 510 F.3d at 1236. The court also concluded the trooper had reasonable suspicion of illicit drug activity, based on the totality of the circumstances, to detain the defendant after returning his documents and to request consent to search. 510 F.3d at 1237-38.

Turning to the present case, we find the State's argument persuasive. The facts here are distinguishable from those in *McSwain* and *Edgerton* due to the differing nature of the violations involved. In *McSwain*, the driver was stopped and detained "for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker." 29 F.3d at 561. In *Edgerton*, the driver was stopped because nighttime conditions made it difficult to read the vehicle's temporary registration tag. 438 F.3d at 1050. Neither case involved a situation in which the officer, at time of questioning the driver, still had some objectively reasonable articulable suspicion that a traffic violation had occurred or was occurring.

Here, Moss initially was stopped and detained because his temporary tag was not "maintained free from foreign materials and in a condition to be clearly legible," as required by K.S.A. 2019 Supp. 8-133. As stated above, a tag is "clearly legible" when it is capable of being read by an officer at a safe following distance. *Orduna-Martinez*, 561 F.3d at 1139. Sergeant Boeckman testified that the temporary tag on Moss' vehicle was wrinkled, and he was unable to read the tag from 15 feet away. Officer Toolin testified that the tag was wrinkled or folded, and the tag light was hanging down over the tag.

11

Toolin said that the tag was impossible to read from a car length behind the vehicle, closer than a safe following distance. That Toolin could read Moss' temporary tag when he came within 5 feet of the vehicle does not negate the traffic violation because the tag remained illegible and in violation of K.S.A. 2019 Supp. 8-133. Indeed, this court has recognized that law enforcement officers may have any number of legitimate reasons for running a license plate check on a moving vehicle, and this important public function is frustrated if the officer cannot read the license plate from his or her moving patrol car. See *State v. Hayes*, 8 Kan. App. 2d 531, 533, 660 P.2d 1387 (1983); see also *United States v. Granados-Orozco*, No. 03-40035-01/02-SAC, 2003 WL 22213129, at *2 (D. Kan. 2003) (unpublished opinion) ("[I]f the tag was not clearly legible to a law enforcement officer following a safe distance behind the vehicle, [K.S.A. 8-133] is violated. . . . Officers should not be required to stop vehicles in order to read their tags.").

Unlike in *McSwain* or *Edgerton*, Officer Toolin's view of the registration tag when he approached the vehicle did not satisfy him that no violation had occurred. Rather, Toolin continued to have an objectively reasonable suspicion that a violation of K.S.A. 2019 Supp. 8-133 was occurring. Under these circumstances, further detention and questioning of Moss was permissible. See *Lyons*, 510 F.3d at 1236 (detention of driver permissible where officer's reasonable suspicion of K.S.A. 8-133 violation "did not evaporate, but rather was confirmed" after stop); *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (officer may detain driver and continue with traffic stop for displaying a registration plate in violation of K.S.A. 8-133 "'even after [the officer] approache[s] the [vehicle] and [is] able, at that point, to read it'"); *United States v. DeGasso*, 369 F.3d 1139, 1149 (10th Cir. 2004) (In contrast to *McSwain*, the violation here was "that the lettering on the license plate was not 'clearly visible,' which remained true even after the trooper approached the truck and was able, at that point, to read it."); *Poke*, 81 Fed. Appx. at 714-15 (where officer could not see vehicle's temporary tag as it traveled along interstate, officer "continued to have an objectively reasonable suspicion

that a traffic violation was occurring" even after confirming presence of license plate affixed to back window).

Based on the analysis set forth above, Officer Toolin had a right to continue his investigation by asking for Moss' driver's license and registration, running a warrants check, and confirming whether the license tag was assigned to the vehicle. In otherwise properly performing those tasks, Toolin learned that there was a warrant for Moss' arrest. During a search incident to Moss' arrest, Toolin discovered drugs and drug paraphernalia in the vehicle. Because the process leading to that discovery did not violate Moss' Fourth Amendment rights, the district court erred in granting Moss' motion to suppress. Accordingly, we need not address the State's alternative arguments for relief.

Reversed and remanded with directions.